**STATE of Minnesota, Respondent,**

v.

**Leonard Joseph RICHARDS, Appellant.**

**No. C1–94–2088.**

Supreme Court of Minnesota.

July 18, 1996.

200

Steven P. Russett, Asst. State Public Defender, St. Paul, for Appellant.

Mark V. Griffin, Asst. Hennepin County Attorney, Minneapolis, for Respondent.

## OPINION

GARDEBRING, Justice.

In this appeal we again consider the case of Leonard Richards. Richards was convicted for the 1987 murder of one of his attorneys, Robert Stratton.[1] The subject of this appeal is Richards recent conviction for the 1982 murder of his half-sister, May Wilson. Richards represented himself throughout this most recent trial and, while he is represented in this appeal by the state public defender, he has filed a supplemental *pro se* brief. The two briefs raise the following eight issues:

1) whether the trial court properly admitted evidence seized during a warrantless search of the murder scene;

2) whether the trial court properly denied Richards' mid-trial motion to relinquish his right to self-representation and to have his standby attorneys take over the case;

3) whether the trial court properly granted the state's motion to strike several prospective defense witnesses;

4) whether the trial court properly admitted several hearsay statements of Wilson, Richards' half-sister;

5) whether the trial court properly denied defense motion to strike a juror who came forward to report a contact between Richards and a friend of the juror's husband;

6) whether the trial court had the legal authority to order Richards to reimburse Hennepin County for funds expended in his defense;

7) whether Richards suffered any prejudice from the unavailability of a trial transcript during his preparation of a supplemental *pro se* brief; and

8) whether the trial court erred when it allegedly answered questions submitted by the jury without bringing Richards to the courtroom.

We affirm the conviction.

Richards and Wilson had a financially close, but emotionally strained relationship. Wilson was frequently hospitalized for physical and mental illnesses and Richards managed her financial affairs. Richards obtained several hospitalization and income protection insurance policies for Wilson's benefit, proceeds from which amounted to over $600,000 during one three-year period. Their personal relationship, however, was difficult. She reported to friends on different occasions that Richards was mean and abusive to her and that she feared him, but that she was reluctant to estrange herself from him because of his involvement in her financial affairs. In March 1982, firefighters, responding to a smoke alarm at Richards' home, discovered Wilson in the backseat of a car in the garage suffering from carbon monoxide poisoning. As the emergency personnel assisted her, she asked "You don't think he's trying to kill me, do you?"

Also in March 1982, Richards leased a storefront located at 1028 West Broadway in Minneapolis in the name of a corporation he controlled, The Administrative Center, Inc. Richards told others he intended to operate two businesses from the space: a taxi service and a mail order company. He had the storefront cleaned, the windows covered, and several boxes moved there. A security lock on the door leading to the storefront basement was installed and two keys were issued to him.

In May, employees and tenants of neighboring businesses noticed and complained of an odor emanating from the 1028 West Broadway storefront. On May 20, the leasing agent requested that Richards investigate and remedy the odor. Richards dispatched James Reichert, one of his attorneys, to check on the building. Reichert entered the building with a key given to

---

1. After his conviction for the Stratton murder, Richards appealed to this court to vindicate his right to self-representation. This court held that Richards had, in fact, made a proper waiver of his right to counsel in favor of representing himself. *State v. Richards,* 456 N.W.2d 260 (Minn. 1990) (*Richards I*). On remand, another trial court reinstated the conviction, forcing this court to issue an order directing a new trial. *State v. Richards,* 463 N.W.2d 499 (Minn.1990) (*Richards II*). At a new trial Richards, now representing himself, was again convicted of the Stratton murder and this court affirmed. *State v. Richards,* 495 N.W.2d 187 (Minn.1992) (*Richards III*).

him by Richards and detected what he described as "a wet basement" smell, but nothing unusual. Reichert, however, was unable to examine the basement because, despite Richards' assurances that a key would be in the basement deadbolt lock, no key was waiting for him. The next day the leasing agent sent one of its employees, accompanied by a locksmith, to the storefront. They entered the building, broke into the basement, and discovered Wilson's decomposing body under some cardboard.

The leasing agent notified the police, who arrived and examined the scene. They located both keys to the security lock in the basement. On the storefront's main floor, police found some boxes containing clothing. They found a dent in the wall containing hair and blood traces, later confirmed to be consistent with those of Wilson; blood was also on both the main and basement floors as well as on the stairs. Based on this physical evidence, police hypothesized that Wilson was killed on the main floor and dragged downstairs.

At two separate hearings on the admissibility of evidence found at the 1028 West Broadway scene, officers testified that the building appeared abandoned. However, the leasing agent representative told the officers who first arrived on the scene that Richards had leased the storefront, that the rent was current, and that he had been in contact with Richards regarding the odor just prior to the discovery of the body. Testimony also revealed that Richards was the sole owner and incorporator of The Administrative Center, Inc. and that some personal property (Richards' mother's clothing and some furniture) was stored at the 1028 West Broadway location. At the conclusion of both hearings, the trial courts ruled the evidence admissible. Both trial courts cited two theories to support their decisions that the search was constitutional: 1) that Richards did not have an expectation of privacy in the area searched, and 2) that the storefront appeared abandoned and, thus, the officers reasonably relied on the apparent authority of the leasing agent to consent to the search.

Several years later, when Richards was tried for Wilson's murder, he represented himself. The trial court appointed attorneys from the Hennepin County Public Defender's (HCPD) office as standby counsel. However, the HCPD informed Richards and the trial court that it would provide no services or assistance beyond the presence of these attorneys in the courtroom as advisors. Accordingly, like any attorney appointed to represent an indigent client, Richards would have to petition the trial court for funds for law clerks, investigators, and office supplies. Richards did so successfully and Hennepin County ultimately provided more than $500,000 for his defense.

The question of what to do should Richards be unable to continue to represent himself was also addressed. Attorneys from the HCPD argued that Richards' decision to represent himself was irrevocable. While the trial court determined that Richards could proceed pro se and that the HCPD attorneys would be available as standby counsel, it also observed that circumstances might eventually dictate that they take over the case. The court expressed concern that a significant delay might result as the standby counsel had no access to the over 20,000 pages of documentation relating to the defense.

After extensive pretrial hearings and over six weeks of jury selection, Richards, claiming "high blood sugar levels," decided he was too ill to continue representing himself and therefore moved the court to relinquish his right to self-representation. Richards asked the court to appoint his standby counsel to represent him. Richards' standby counsel opposed the request, citing their lack of familiarity with the evidence and their belief Richards had made the request only in pursuit of a mistrial. The trial court heard argument from Richards, his standby counsel, and the prosecution and denied Richards motion to relinquish his right of self-representation. Richards continued to represent himself.

Later during the trial a juror sought a meeting with the court to disclose a contact between a family friend of the juror and Richards. Apparently, Richards called a funeral parlor operated by the friend regarding

arrangements for his burial and stated that he expected to be dead soon. The friend mentioned the contact to the juror's husband, who, in turn, mentioned it to the juror. The trial court allowed Richards to examine the juror, but ultimately ruled the contact would have no impact on the juror's ability to be impartial.

Prior to and during the trial, the court held hearings to consider offers of proof from Richards regarding each of the witnesses on his extensive witness list. Proceeding witness by witness, the court heard Richards' offers of proof, as well as the prosecution's objections, and struck from the list those witnesses it deemed irrelevant.

The jury found Richards guilty of first degree murder. Minn.Stat. § 609.185(1). The trial court sentenced him to life in prison and ordered Richards to reimburse Hennepin County $50,000 in partial restitution for the monies expended by the county for his defense. In ordering the reimbursement, the court noted that Richards had wasted at least that sum on disbursements unnecessary to his defense.

## I. Was the warrantless search of 1028 West Broadway constitutional?

■ Richards' first issue involves the warrantless search of the 1028 West Broadway storefront. He argues that, because the police had no warrant and their conduct did not fall within any exception to the Fourth Amendment's prohibition of warrantless searches, the evidence found at the crime scene must be suppressed.

■ The Fourth Amendment generally requires a warrant before the government can search the home or business of a private individual. *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). If the defendant has a reasonable expectation of privacy in the area searched, then the police should obtain a warrant before searching. *Katz v. United States,* 389 U.S. 347, 354, 88 S.Ct. 507, 512–13, 19

L.Ed.2d 576 (1967); *State v. Tungland,* 281 N.W.2d 646 (Minn.1979). The Fourth Amendment protection clearly reaches to business premises as well as residential property. *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). Thus, searches conducted without a warrant on a business premise (except for inspection searches, which the search at issue here clearly was not) are presumptively unreasonable unless an exception to the warrant requirement can be found to apply. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

■ There are some well-established exceptions to the warrant requirement, instances when the police may, for a variety of reasons, search and seize without the official blessing of a warrant. Several of these theories may be relevant here. A warrantless search is permissible, for instance, when the delay necessary to obtain a warrant might result in the loss or destruction of the evidence. *See, e.g., Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Also, police are not required to obtain a warrant to search an area if someone with legal authority over that area consents to the search. *See, e.g., United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

The state adopts the reasoning of the two trial courts which heard this motion below and ruled the search constitutional. Both trial courts held, first, that Richards lacked standing to contest the search and, second, that the property appeared to have been abandoned, so it was reasonable for the officers to rely on the leasing agent's consent to the search. The state also asserts that the smell emanating from the storefront would have inevitably led to the discovery of the body and other evidence.

■ The state's argument that Richards lacks standing to contest this search appears to be dispositive of the issue.[2] It is

---

**2.** Although we conclude that Richards had no standing to contest the search, we believe it is appropriate to comment on the other theories relied upon by the lower courts and the state.

The "inevitable discovery" argument, relied upon by the state, may be disposed of easily. The state here argues that the evidence seized from the storefront may be admitted based on one of two closely related theories—the so-called

clear that the Fourth Amendment's protection is personal and individual, regardless of whether the one protected is a natural person or a legal fiction, such as a corporation. *See* LaFave, Search and Seizure, at § 11.3(d) (3rd ed. 1996). A defendant who cannot demonstrate a legitimate expectation of privacy relating to the area searched or the item seized will not have standing to contest the legality of the search or seizure. *Rakas v. Illinois*, 439 U.S. 128, 138–48, 99 S.Ct. 421, 427–33, 58 L.Ed.2d 387 (1978). Generally, a person doing business as a corporation, even if he or she is the sole shareholder, may not vicariously assume the corporation's Fourth Amendment rights. *See Lagow v. United States*, 159 F.2d 245, 246 (2nd Cir.1946). However, while the U.S. Supreme Court has ruled that an employee may contest the search of his business premises if the area searched was "one in which there was a reasonable expectation of freedom from government intrusion," *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968), it has not conclusively determined the status of a sole proprietor's standing in his business premises. LaFave, Search and Seizure, *supra*, at § 11.3(d). Moreover, courts have not interpreted *Mancusi* as a grant of individual standing to corporate officers relative to the corporate premises. *Id.*

There appear to be two lines of inquiry into the standing of a business owner to contest the search of his business for evidence to be used against him personally. Some courts require the individual to demonstrate a "nexus between the area searched and the work space of the defendant." *United States v. Britt*, 508 F.2d 1052, 1056 (5th Cir.1975). Others have examined the defendant's relationship to the evidence seized. *See United States v. Mancini*, 8 F.3d 104 (1st Cir.1993). Neither inquiry lends support to Richards' contention that he has standing to contest the search of the 1028 West Broadway space. In *Britt*, for example, the area searched was a storage area where the defendant spent no time working. There, the court determined the defendant lacked standing. *Britt*, 508 F.2d at 1055. Similarly, the 1028 West Broadway space appears to have merely been storage space for Richards. The record contains no evidence that Richards actually ran any sort of business from the location. Thus, Richards had no workspace at the storefront and therefore no standing to contest the search there.

Turning to Richards' relationship to the items seized, we again find no support for his claim of standing to contest the search. In *Mancini*, an appointment book containing personal and business entries was seized. The court found that the presence of many personal appointments suggested that the overall nature of the document was appropriately nonpublic, thereby justifying a legitimate expectation of privacy and standing to

---

"inevitable discovery doctrine" or the "independent source doctrine." The former applies if the police would have inevitably discovered the evidence, absent their illegal search. *Nix v. Williams*, 467 U.S. 431, 441, 104 S.Ct. 2501, 2507, 81 L.Ed.2d 377 (1984). The latter will countenance introduction of otherwise illegally-seized evidence if the police could have retrieved it on the basis of information obtained independent of their illegal activity. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

There appears to have been no separate investigation into the odor coming from 1028 West Broadway; thus the "independent source doctrine" does not apply, because there was no "source" independent of the police activity triggered by the evidence of criminal activity, the smell. In addition, as it was the odor that brought the leasing agent and, thereby, the police, the "inevitable discovery doctrine" seems to beg the question. Once the body was discovered, it was apparent that the murder had not taken place recently. Police therefore could easily have—and should have—preserved the integrity of the scene while waiting for a readily-obtainable warrant.

The trial courts also relied on the notion that the officers had necessary consent to the search. A person with common authority over a property can grant permission to the police to search. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). But, a landlord may not grant police such permission unless the tenant has abandoned the property. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960). As the agent had recently spoken about the odor to Richards, who had dispatched someone to investigate, and as Richards' rent was current, it appears that the leasing agent knew that Richards had not abandoned the property. Thus, the leasing agent could not consent to the search.

contest the search. *Mancini*, 8 F.3d at 108. In contrast, the storefront contained a few boxes—which held some of Richards' mother's clothing and some magazines—and some furniture, a table and a few chairs. Unlike the appointment book in *Mancini*, none of these items seem the sort of items that one keeps private. Moreover, in *Mancini* the defendant was held to have standing as to an attic storage room where his "belongings were clearly labeled and were segregated from other items in the secured archive attic." *Id.* at 110. Richards' storage of items at 1028 West Broadway does not reveal any similar effort to keep private the items stored; indeed, nothing about the items or the manner in which they were stored reveals anything of a personal or private nature. In short, neither the nature of the storefront nor Richards' use of it, nor the property stored there indicates a justifiable expectation of privacy on the part of Richards personally. Thus, we hold that he had no such expectation and may not contest the introduction of the evidence found there.

## II. Was Richards denied his right to counsel?

▮ Richards' next contention of error revolves around his self-representation. He alleges that the trial court abrogated his right to counsel and to the effective assistance of counsel when it denied his request to relinquish his right to self-representation and to have his standby counsel proceed in his place. The state contends that Richards' request was not timely and was, in fact, merely another of many attempts to delay the proceedings and manipulate the court. We must consider two questions: first, whether a criminal defendant has an absolute right to reclaim his right to counsel, having once relinquished it, and, second, whether Richards was denied the effective assistance of counsel, in this case standby counsel? Central to this inquiry is the nature of the role of standby counsel. Is their role akin to that of the phone psychics who advertise on late-night television, giving advice, which may or may not be heeded, only when asked? Or is it more like that of a theatrical understudy, ready to step into the trial should the primary actor, the defendant, be for any reason unable to continue? This question is one of first impression in Minnesota.

In *Faretta v. California*, the U.S. Supreme Court held that a criminal defendant has a constitutional right to represent himself and thus may voluntarily and intelligently elect to do so and waive his right to counsel. 422 U.S. 806, 834–35, 95 S.Ct. 2525, 2540–41, 45 L.Ed.2d 562 (1975). A defendant wishing to undertake his own defense need not be a lawyer, or even possess legal skills, but the trial court, when inquiring whether the defendant's waiver of counsel is voluntary and intelligent, should emphasize to the defendant the "dangers and disadvantages of self-representation." *Id.* at 835, 95 S.Ct. at 2541. To partially ameliorate some of these disadvantages, the Court observed that a state "may—even over objection by the accused—appoint 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Id.* at 835 n. 46, 95 S.Ct. at 2541 n. 46. In Minnesota, standby counsel must be appointed for any defendant choosing to represent himself in a felony case. Minn.R.Crim.P. 5.02, subd. 1. As noted earlier, trial court in this instance appointed standby counsel from the Hennepin County Public Defender's staff.

▮ Even where a criminal defendant has chosen self-representation, and defense counsel are present on "standby," however, the trial court still has the responsibility and power to regulate the conduct of the court proceedings. The Court stated flatly in *Faretta* that self-representation is not a license to disrupt, obstruct, or otherwise impede the trial proceedings: "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46. The court must not allow self-representation to be used merely to delay a trial or to seek a mistrial. *United States v. Flewitt*, 874 F.2d 669, 674 (9th Cir.1989); *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46 (self-representation is not "a license not to comply with the relevant" rules of law and court procedure).

On the other hand, neither can a defendant use his standby counsel as a means of delay or obstruction. A defendant cannot orchestrate appearances by standby counsel or alternate his position on whether or not he wishes to self-represent for purposes of delay. *United States v. Taylor*, 933 F.2d 307, 311 (5th Cir.1991) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984)). Appellate courts have recognized that a trial court's discretion in this area may be sorely tested during a trial in which the defendant represents himself. *See Richards II*, 463 N.W.2d at 499; *Taylor*, 933 F.2d at 311.

In addition, the parameters of the right to self-representation necessarily have an impact on the responsibilities of standby counsel. A defendant, for example, has the right to conduct his or her own defense and thus need not heed the advice of standby counsel. *McKaskle*, 465 U.S. at 174, 104 S.Ct. at 949. Thus, standby counsel's role is fundamentally advisory, and "[p]articipation by standby counsel * * * should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* at 178, 104 S.Ct. at 951. Also, a self-representing defendant cannot later complain that he did not understand or was unable to negotiate the proceedings—that is the purpose of standby counsel. Standby counsel are present "to steer a defendant through the basic procedures of trial" and "to relieve the judge of the need to explain and enforce basic rules of [the] courtroom * * *." *McKaskle*, 465 U.S. at 184, 104 S.Ct. at 954. There is, however, little caselaw directly discussing the issue here, namely, whether or not standby counsel should also fill the role of "second chair" counsel and be ready to step in to continue the trial should the defendant be unable or unwilling to continue his or her own defense.

Richards argues that his right to relinquish his self-representation, and thereby return his standby counsel to "active duty," is absolute. We disagree. None of the cases cited by Richards indicate that self-representation is some sort of legal overcoat to be worn when it is comfortable to do so and discarded when it is not. In its discussion of standby counsel, the *Faretta* Court enshrined no such absolute right to relinquish one's self-representation. Instead, it referred specifically to the possibility of deliberate "obstructionist conduct" on the part of the defendant in instances where a defendant chose self-representation and standby counsel were appointed. *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46.

Richards is quite familiar with the type of behavior the *Faretta* Court addressed. In our first review of Richards' conviction for the Stratton murder, we observed that Richards was unquestionably "manipulative and argumentative," persisting often in "wandering into annoying irrelevancies" and always "dissatisfied with anyone's competence except his own." *Richards I*, 456 N.W.2d at 266. When we again considered the Stratton matter, we noted specifically that the trial court possessed the discretionary ability to determine if Richards' behavior should result in a waiver of his right to represent himself. *Richards II*, 463 N.W.2d at 499. During our final review of the Stratton matter, Richards alleged that the trial court's conduct during trial had included prejudicial comments and hostility and impatience and that the trial court "castigated and threatened" him. We concluded that, in fact, the court had behaved commendably under circumstances made vexatious by Richards' repeated disruptive behavior. *Richards III*, 495 N.W.2d at 197.

Indeed, in our consideration of the Stratton matter, mindful of Richards' record of poor courtroom behavior and attempts to manipulate trial proceedings, we qualified his ability to relinquish his right to self-representation, stating that "[d]efendant shall not be permitted to request substitution of standby counsel unless, in the trial court's discretion, his request is timely and reasonable and reflects extraordinary circumstances." *Richards II*, 463 N.W.2d at 499. This appears to us to remain the proper standard and the trial court acted on it here. When Richards sought to relinquish his right of self-representation and to "hand-off" the trial to standby counsel, the trial court carefully balanced his motion against the progress of the trial to date, the readiness of standby counsel to proceed, and the possible disruption of the

proceedings. We cannot say, in light of all of the circumstances, especially Richards' participation in earlier criminal proceedings, that the trial court abused its discretion when it denied his request.

■■■ Richards also contends that by not preparing to take over the case should he suddenly decide to relinquish his self-representation, standby counsel were ineffective. We have found no case that squarely addresses the effectiveness of standby counsel. *See United States v. Windsor*, 981 F.2d 943, 947 (7th Cir.1992). There are, however, cases policing what might be termed the outer perimeter of the role of standby counsel. For example, the law places standby counsel at the mercy of the defendant's plans, or lack thereof, for the presentation of a defense. If the defendant wishes standby counsel to be involved, to render impromptu advice, or even to appear before the court, the defendant must authorize the standby counsel to do so. *McKaskle*, 465 U.S. at 183, 104 S.Ct. at 953. If the defendant wishes the standby counsel not to participate, then they must simply attend the trial. *See State v. Parson*, 457 N.W.2d 261, 263 (Minn.App. 1990) *rev. denied* (Minn. July 31, 1990) (reversible error for standby counsel to leave the courtroom while trial in progress).

■■■ It is apparent that the role of standby counsel is fundamentally different from the role of counsel generally. When a lawyer is acting as standby counsel, the defendant's other rights occasionally intervene to *prevent* the standby counsel from acting as would be expected if he or she were counsel for the defendant. *See, e.g., McKaskle*, 465 U.S. at 174, 183, 104 S.Ct. at 949, 953. Nevertheless, whether standby counsel and lawyers acting as counsel for defendants should be held to the standards for the effective assistance of counsel announced by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) remains an open question. We think that a different standard, coextensive with, but not the same as that of *Strickland*, may govern the activities of standby counsel, but we decline to announce such a standard here. Instead, it is sufficient for us to state that, whatever the standard for the effective assis-

tance of standby counsel may be, it was met in this instance.

Richards chose to confine his standby counsel to a very passive role: while he frequently consulted with standby counsel, he did not include them in his strategy planning or allow them to appear before the court. He did allow them to draft a single legal memorandum for the court, but otherwise their participation was strictly advisory. Moreover, Richards controlled access to the discovery documents, keeping them in his workrooms at the prison and the courthouse; neither of the two public defenders, who during this lengthy trial continued to carry full caseloads, had the opportunity to familiarize themselves with any of the discovery materials. To truly prepare to continue the trial in the event Richards faltered would have required extraordinary efforts on the part of two public defenders who simultaneously carried separate full caseloads. These attorneys were truly standby, to be used if "necessary." *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46.

This court is familiar with Richards' obvious competence to plead his case (he represented himself through two trials and three appeals in the Stratton murder prior to the instant trial), as well as with his dissatisfaction with anyone else's ability. *See Richards I*, 456 N.W.2d at 266. Richards' standby counsel were not intimately familiar with the discovery and the defense strategy because Richards wished it to be thus. It was his right to make such decisions, to conduct his defense as he saw fit. *McKaskle*, 465 U.S. at 174, 104 S.Ct. at 949. We are not inclined to hold his decisions against his standby counsel. It appears that his standby counsel did all that he allowed them to do. Therefore, we conclude that he was not denied effective assistance of counsel.

### III. Was Richards denied his right to present a defense?

■■ Richards' third contention of error relates to the trial court's striking of several prospective defense witnesses. At the close of the state's evidence, the trial court requested that the defense be prepared to proceed. The defense, however, asked for a

continuance, citing incomplete preparation. Noting that the defense had approximately two years to prepare; the trial court denied the request, characterizing Richards' actions as manipulative. The defect in the defense's preparation appeared to be its witness list, which while containing only twelve names, also contained categories of potential witnesses, numbering 100 or more additional persons. Richards complained that he and his staff had not had sufficient opportunity to interview all prospective witnesses and had not decided yet who among these many he would call. For its part, the state objected that many witnesses were irrelevant to the proceedings. Accordingly, the court indicated it would conduct a hearing to review each witness' relevance and necessity. The court followed the procedure adopted in the Stratton trial and approved of by this court: Richards presented an offer of proof regarding each witness, the prosecution made objections, if it wished, and the trial court ruled on whether the witness was competent, whether the evidence was relevant, and whether the testimony might be repetitive. *See Richards III,* 495 N.W.2d 187, 195–96 (Minn.1992).

Over the course of several days, the trial court reviewed Richards' list witness by witness. Richards had the opportunity to present offers of proof for approximately 100 witnesses. For many witnesses, Richards was unable to produce a coherent summation as to what they might say on the stand or as to what, if any, relevance they had to the case. Examples of the latter category included the Speaker of the Minnesota House of Representatives, a Hennepin County District Court Judge who had been the chief prosecutor in the Stratton trial, and the Hennepin County Attorney. The court allowed approximately 20 witnesses and the parties reached stipulations obviating the need for testimony in approximately 5 instances. The remainder were struck as collateral, repetitive, or irrelevant. At trial, Richards actually called 15 witnesses. Richards contests the striking of 11 of the prospective witnesses.

Criminal defendants must be accorded a "meaningful opportunity to present a complete defense," *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984), including "the right to offer the testimony of witnesses." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Witnesses, however, must be relevant and must not be repetitive and the trial court, therefore, "is justified in placing limitations on" the number of witnesses. *Richards III,* 495 N.W.2d at 195; *see also* Minn.R.Evid. 401, 402, and 403 (defining relevant evidence and outlining conditions for exclusion of some evidence).

It is important, we think, to note that here the trial judge followed a procedure we previously approved. Reviewing Richards' conviction for the Stratton murder, this court observed that while "the right to present witnesses is constitutionally protected, the accused 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Richards III,* 495 N.W.2d at 195 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)). What we said in that case about the trial judge's procedure for dealing with Richards' extensive witness list holds equally true here. "While it is true that a significant number of defense witnesses were stricken, the process employed by the court was neither arbitrary nor mechanical. The judge proceeded down the defense witness list in an orderly manner and asked for an offer of proof as to each person." *Id.* It is "well within the discretion of the trial judge to regulate the presentation and direct examination of the defense witnesses." *Id.* (citing *Batsell v. United States,* 403 F.2d 395, 401 (8th Cir.1968)). The trial court was careful and followed an approved procedural model in dealing with Richards and his efforts to put forward a defense. The court did not abuse its discretion.

## IV. Were out-of-court statements by the victim improperly admitted?

Next on Richards' list of errors is the admission of several hearsay statements of the victim May Wilson. Six statements are at issue. The trial court held a hearing to consider the admissibility of these statements and issued a memorandum decision

that each of the six was admissible. The disputed statements are:

1) Wilson's deposition testimony in 1979 relating to an insurance matter;

2) Wilson's statements to Andrea Gelb, a social worker working with Wilson's mother. Wilson told Gelb that she was concerned about Richards' handling of her money and that she was unaware how much money she had;

3) Wilson's statements to Virginia Osberg, in which she said, while hospitalized, that she would not be returning to live with Richards;

4) Wilson's statements to Joyce Rude, whom Wilson told she was afraid of Richards and that he would not let her handle her own financial affairs;

5) Wilson's statements to June Rankila, whom she told she was planning to go to Richards' house to try on clothes, to go to the V.A. hospital, and to go see her lawyer; and

6) Wilson's statements to Judith Eckstrom, a counselor at the Parkview Treatment Center. Wilson told Eckstrom she was afraid of Richards, wanted to end her relationship with him, and that he beat her.

Evidentiary decisions, generally, are left to the sound discretion of the trial court. We have held previously that appellate courts should "not lightly overturn" trial court evidentiary rulings. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). The trial court heard argument for and against the admission of Wilson's statements and then made separate determinations whether or not to admit the evidence. With regard to Wilson's deposition testimony, it held that the deposition setting satisfied the need for reliability and admitted these statements under the catch-all exception to the hearsay rule, Minn. R.Evid. 804(b)(5). The court reviewed Wilson's statements to Gelb and Osberg and, noting that these statements were corroborated by the deposition testimony, also admitted these statements under the catch-all exception.

■■■ The trial court characterized Wilson's statements to Rude as indicative of fear. This court articulated a test for the admission of statements of fear: the trial court must consider, first, whether the victim's state of mind is relevant and, second, whether the probative value of the statement outweighs its possible prejudicial effect. *State v. Blanchard,* 315 N.W.2d 427, 432 (Minn.1982). If the statement is admitted, the court must give the jury a limiting instruction. Because Richards raised accident and/or suicide as a defense to a homicide charge, the trial court found the victim's state of mind was relevant. *See id.* The trial court also determined that the statements were more probative than prejudicial and, therefore, admitted the evidence and gave the jury the necessary instruction.

■■■ The trial court admitted Wilson's statements to Rankila as indicative of her then-present state of mind. *See* Minn. R.Evid. 803(3) (1994). And, lastly, the trial court determined that Wilson's statements to Eckstrom were admissible under the medical diagnosis and treatment exception to the hearsay rule. *See* Minn.R.Evid. 803(4).

In short, each of these decisions was reasoned and had a solid legal basis. We see no reason to substitute our judgment for that of the trial court. Richards' allegations that the trial court erred in its conclusions regarding the indicia of reliability of these statements do not rise to the level necessary to overturn the exercise of that discretion.

## V. Was a juror erroneously allowed to sit?

■■■ The fifth allegation of error relates to the trial court's decision to allow a juror who came forward to report a contact between Richards and a friend of the juror's husband to continue to serve. The contact in this case was a conversation between the juror's husband and a friend who owns a mortuary. The friend mentioned to the husband that he had received a call from a Leonard Richards, who stated he expected to die soon. The husband, in turn, reported the conversation to the juror, who brought it to the attention of the court. The court examined the juror *in camera,* but Richards alleged that the juror was obviously prejudiced—she "thinks I'm going to kill myself"—and requested voir dire. The court

allowed the questioning and the juror indicated she spoke to the court because she thought the court ought to know, "in case you [Richards] were suicidal or something." She also indicated that she had no way to prevent this conduct, that her husband simply mentioned the conversation out of the blue. The court asked the juror if she felt that her ability to be fair had been compromised, to which the juror responded that it had not. The court heard argument from both Richards and the prosecutor and ruled that it was convinced the juror could remain impartial.

 Private communications with a juror sitting on a criminal case about the pending matter are presumptively prejudicial, *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), and it is misconduct for a juror to initiate such contact. *State v. Landro*, 504 N.W.2d 741, 745 (Minn.1993). When confronted with the possibility of some outside influence on the jury, regardless of its source, the trial court must inquire into its effect. *See State v. Cox*, 322 N.W.2d 555, 558 (Minn.1982). The presumption of prejudice to the defendant is not conclusive; rather, the government bears the heavy burden of establishing that the contact involving the juror was harmless. *Remmer*, 347 U.S. at 229, 74 S.Ct. at 451. The test for whether a juror can continue to be impartial is whether he or she "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *State v. Andrews*, 282 Minn. 386, 394, 165 N.W.2d 528, 534 (Minn. 1969).

 When reviewing the trial court's decision to replace the juror or not, this court must consider the nature and source of the prejudicial material, the number of jurors exposed to it, the weight of the evidence, and the likelihood that curative measures taken were effective. *Cox*, 322 N.W.2d at 559. Because the decision whether the affected juror may continue to sit involves determinations of credibility and demeanor, which are best left to the trial court, this court affords the trial court's decision significant deference. *State v. Logan*, 535 N.W.2d 320, 323 (Minn.1995).

Richards contended at trial and before this court that this contact might have had a prejudicial effect on the outcome of his case and argues, therefore, that the trial court's decision to allow the juror to continue with the trial was mistaken. The trial court, however, followed the procedure outlined in the prior cases of this court and made a finding as to the juror's ability to continue to be impartial.

The trial court was in the best position to make necessary findings regarding the juror's ability to continue to sit. In addition, Richards was afforded an opportunity to elicit testimony from the juror regarding any damage to her impartiality. This contact was a peripheral matter, not one directly implicating the question of guilt or innocence. Moreover, the juror demonstrated considerable maturity as well as a serious commitment to her oath of impartiality by reporting to the court an accidental and minimal contact, such as this one. We find no evidence of prejudice and believe the trial court's curative measures were proper. Accordingly, the trial judge's decision was, in our view, not an abuse of discretion and, thus, we decline to disturb it.

## VI. Was Richards properly ordered to reimburse the county for certain defense expenses?

Richards' next argument asserts that the trial court lacked the legal authority to order him to reimburse Hennepin County the sum of $50,000 for funds expended in his defense. A trial court may, as part of a sentence, order a defendant either to pay restitution, Minn.Stat. § 609.10(5) (1994), or to reimburse sums expended by the prosecution or by the government to compensate a public defender or other appointed counsel. Minn. Stat. §§ 631.48 and 611.35, subd. 1 (1994). But, restitution must be paid only to a victim. Minn.Stat. § 609.10(5) (1994); *State v. Fader*, 358 N.W.2d 42, 48 (Minn.1984). A trial court may order a defendant "represented by a public defender or appointive counsel" to reimburse the government for the compensation paid the public defender or appointed counsel, if the defendant is financially able to pay. Minn.Stat. § 611.35, subd. 1 (1994).

However, no recovery of the salaries paid prosecuting attorneys is allowed. Minn.Stat. § 631.48 (1994). In this instance, the trial court ordered Richards to reimburse the county for a portion of the funds expended on his behalf, but did not specify its rationale for doing so. The court did, however, note that it was ordering the reimbursement because, in its estimation, Richards had wasted at least that much. While we believe the trial judge should have been more specific in his reasoning, we find adequate support in the record to credit the judge's conclusion. Thus, we affirm the reimbursement order.

## VII. Are Richards *pro se* arguments meritorious?

Richards' last two arguments were raised in his *pro se* supplemental brief to this court. He alleges that he suffered prejudice because a trial transcript was not available to him during his preparation of a supplemental *pro se* brief. Also, he contends that the trial court answered questions submitted by the jury without bringing Richards into the courtroom. The latter contention is meritless and we reject it as such. Richards alleges that the trial court telephoned him in jail during the evening of the jury's first day of deliberations to inform him that the jury had submitted two questions. Richards further alleges that the judge answered these questions to the jury outside of Richards' presence, in violation of Richards' right to be present. *See State v. Bowles,* 530 N.W.2d 521, 535 n. 20 (Minn.1995). Richards offers no affidavits or other support to bolster these allegations and there is nothing in the record substantiating this claim.

■ Richards' contention that he was entitled to a trial transcript to effect his appeal presents a colorable issue. An indigent defendant in Minnesota may elect to perfect his appeal *pro se* or to have the State Public Defender represent him on appeal. Minn. R.Crim.P. 28.02, subd. 5 (1–5, 12–14). If a defendant chooses to proceed *pro se,* the public defender must first file a brief on defendant's behalf. Then, the defendant may elect to proceed *pro se* or to file a supplementary brief. Minn.R.Crim.P. 28.02, subd. 5(12), (16). A *pro se* defendant perfecting an appeal may request a transcript and,

after consultation with the public defender concerning the need for the transcript, be provided with one temporarily. *Id.* at subd. 5(17). The transcript must be returned to the public defender upon expiration of time for filing of any supplemental brief. *Id.* at subd. 5(18 and 19).

Richards complains that he was not provided with a transcript and therefore his ability to file a supplemental brief was compromised. The state contends that by electing to have the public defender represent him on appeal, Richards has forfeited his right to have a transcript delivered to him. The public defender agrees with the defendant, that he had a right to review a transcript.

The rules of criminal procedure allow a defendant the opportunity to file a supplemental brief. *Id.* at 5(12). If a defendant chooses to do so, he must confer with the public defender regarding his need for a transcript. *Id.* at 5(17). If he still wants access to a transcript, the public defender's office will provide its copy for the defendant's use. *Id.* at subd. 5(18, 19). Thus, Richards should have been provided with a transcript, but he was not entitled to have a separate transcript delivered to him. The rule clearly states that he is entitled to use the copy belonging to the public defender and must confer with the public defender for use of that copy. *Id.* at 5(19). Richards did not do so. Nevertheless, Richards was able to file a supplemental brief and does not seem to have been prejudiced by the lack of the transcript. His recollection of the trial and of incidental matters was accurate.

Affirmed.

ANDERSON, J., took no part in the consideration or decision of this case.