STATE of Minnesota, Respondent,

v.

Tina DeAnn LEJA, Appellant.

No. C9–02–863.

Court of Appeals of Minnesota.

May 6, 2003.

Mike Hatch, Attorney General, St. Paul, and Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, for respondent.

John Stuart, State Public Defender, Michael F. Cromett, Assistant Public Defender, Minneapolis, for appellant.

Considered and decided by TOUSSAINT, Chief Judge, HUDSON, Judge, and PORITSKY, Judge.*

## OPINION

HUDSON, Judge.

This appeal is from a conviction and sentence for aiding second-degree murder and accomplice-after-the-fact. Appellant Tina Leja was sentenced to 210 months on the first offense and to a consecutive, stayed sentence of 81 months on the second offense. We conclude that appellant was properly convicted of aiding second-degree murder and that the trial court did not abuse its discretion in sentencing her for that offense; but that the conviction for accomplice-after-the-fact and the accompanying sentence cannot stand. Therefore, we affirm in part and vacate in part.

## FACTS

Leja was charged with aiding second-degree murder, accomplice-after-the-fact, and other offenses, following the death of Bobby Dee Holder on July 5, 2001. The police investigation into Holder's death revealed that Holder died when he visited the residence of Leja's boyfriend, Darnell Smith. Holder's torso was discovered partially buried on a rural Wisconsin property owned by Leja's father. The rest of his

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

dismembered body was never found. After the murder, Leja and Smith went to Mississippi, where they stayed, using fake names, until their arrest. Leja was tried separately from Smith and his brother, Chaka Smith, who was also charged in Holder's murder.

The state's theory was that Holder, who met Leja when he sold some custom tire rims to Darnell Smith, had developed a romantic interest in Leja, and had called her cell phone several times on the day of the murder. The state argued that Leja, at Darnell Smith's request, lured Holder to Darnell Smith's apartment by telling Holder that Smith was not home. When Holder arrived at the apartment, Darnell Smith and Chaka Smith jumped him, shot and stabbed him, and dismembered his body. Darnell Smith later instructed Leja and Andre Parker, another resident in Smith's apartment building, to drive Holder's body parts to Wisconsin, where Leja and Parker attempted to bury Holder's torso on the property owned by Leja's father.

The defense argued that Leja had no involvement in Holder's murder and lived in fear of Darnell Smith, who coerced her into helping dispose of Holder's body. The defense claimed that Leja left evidence where she hoped police would find it and tried in other ways to alert authorities to the crime without angering Smith. Neither party called Darnell Smith to testify.

The state's key witnesses to the events of July 5, 2001, were Ramon Smith, another brother of Darnell Smith, and Ramon Smith's girlfriend, Katrina Valley. They testified that they drove to Darnell Smith's apartment that night around 9:30 or 10:00. They entered the apartment and were present in Darnell Smith's bedroom when Leja received a call from Holder on her cell phone.

Valley testified that she saw Leja in the bedroom and saw Darnell Smith sitting on the bed cleaning a handgun. At some point, Leja received a call on her cell phone and Valley testified that Darnell Smith "scooted up behind" Leja and whispered something in her ear. Valley heard Leja tell the caller, "He's not here right now. You can come over." Valley testified that she and Ramon Smith left shortly after that.

Ramon Smith testified that when he entered the bedroom, Leja was talking on her cell phone. Ramon Smith testified that he saw Darnell Smith whispering in Leja's ear as she talked on the phone, and heard Leja telling the caller, "He's not here." After Leja finished the phone call, Ramon Smith testified that Darnell Smith asked him to stay and help him beat up Holder. According to Ramon Smith, Leja heard this request and had no reaction to it. Ramon Smith testified that he and Valley "staged an argument" in order to get out of the situation.

The state's critical witness with respect to the disposal of Holder's body parts was Andre Parker. Parker described how Darnell Smith invited him into his bedroom and showed him Holder's body parts stored in a cooler, then enlisted Parker to help dispose of them.

After an unsuccessful attempt to find a disposal site for the body in St. Paul, Smith had Parker help him put Holder's body parts into Leja's car. Smith then told Parker to drive Holder's car and follow Leja in her car, and they set off for Wisconsin, where they left Holder's car at a park-and-ride lot. Parker testified that he then got into Leja's car and she drove to her father's property, describing along the way how Smith had "forced her to manipulate Holder into coming to his residence," and how Smith had assaulted and then shot Holder. Leja told Parker that during the murder she was standing in the

corner of the room trying to stay out of the way.

Leja testified that she witnessed Holder's murder and that she drove his body parts to her father's Wisconsin property. Leja testified that Darnell Smith was very controlling, and that on July 5, 2001, she talked with a girlfriend at length about the relationship and came to a decision to end it. When she drove to Smith's apartment that night, however, and described some of this conversation to Smith, he became very angry, ordering her to sit on the bed and hitting her with an alarm clock. Smith then checked Leja's cell phone for incoming calls and saw Holder's number.

Leja testified that when Holder called her later that night, Smith said to tell Holder that he was not at the apartment but that Holder could come by and pick up the tools he had left there. Leja testified that when she heard Holder's car arrive, she met him at the front door. They entered the bedroom and she showed Holder the tools, which were against the wall. Smith then came into the bedroom and grabbed Holder, and he and Chaka Smith began hitting Holder. Leja testified that Holder struggled, making it out to the front door, but then she heard two shots, and the two men dragged Holder's body into the bedroom. Leja testified that she fell asleep with Holder's body still lying on the floor.

Leja corroborated much of Parker's testimony about the drive to Wisconsin. Leja testified that they drove to Leja's father's property, which Leja testified she picked because she hoped her father would discover the body. Leja also testified that she disturbed things in the garage, and attempted to leave fingerprints to show that she had been there.

Leja admitted that she did not warn Holder that Darnell Smith was angry, nor did she ask Darnell Smith and Chaka Smith to stop assaulting Holder. Neither did she call the police on the trip to Wisconsin, although she had a cell phone and was at some point alone in her car. Leja admitted that she did not tell her family about her knowledge of Holder's body parts, and that she lied to police when they questioned her. When Leja testified that she was "deliberately leaving a trail" for police after the murder, and was "[t]rying to get help," the prosecutor asked her why, "when you were arrested by the police department in Mississippi, you said nothing?" Defense counsel objected and then asked for a mistrial, which the trial court denied after the prosecutor assured the trial court that because Leja's attorney had advised her to remain quiet, he would not persist in that line of questioning. The trial court sustained the defense objection and instructed the jury to disregard the question.

Defense counsel requested instructions on both duress and necessity arguing that there was evidence from which the jury could conclude that Leja was under duress from Darnell Smith on July 5, 2001, and that her actions two days later in helping dispose of Holder's body were justified by necessity. The trial court instructed the jury on the defense of duress but declined to give an instruction on necessity.

The jury found Leja guilty of aiding second-degree murder, accomplice-after-the-fact, and second-degree assault. The jury found Leja not guilty of conspiracy to commit second-degree assault. The trial court imposed a sentence of 210 months for aiding second-degree murder, an upward durational departure, citing the concealment of the victim's body and Leja's violation of a position of trust. The trial court imposed a consecutive, although stayed, sentence of 81 months for the accomplice-after-the-fact conviction.

## ISSUES

I. Did the prosecutor commit prejudicial misconduct in asking appellant about her post-arrest silence?

II. Did the trial court err in failing to question jurors about possible outside influences?

III. Did the trial court abuse its discretion in admitting out-of-court statements?

IV. Can appellant be convicted of both second-degree murder for aiding in the offense and as an accomplice-after-the-fact for the same offense?

V. Is the evidence sufficient to support the conviction for aiding second-degree murder?

VI. Did the trial court abuse its discretion in its upward sentence departure?

## ANALYSIS

### I

■ Leja argues that the prosecutor's question concerning her silence following arrest was a denial of her right to a fair trial. Leja contends that although the trial court sustained the objection to the question and instructed the jury to disregard it, it constituted prejudicial prosecutorial misconduct and requires a new trial. We disagree.

In determining whether prosecutorial misconduct requires a new trial, this court looks to whether the misconduct likely played a substantial part in influencing the jury to convict. *State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974). Misconduct that is "unusually serious" requires a new trial unless it is harmless beyond a reasonable doubt. *Id.*

In addition, the supreme court has held that counsel-advised silence is protected to the same extent as silence that follows a Miranda warning. *State v. Billups,* 264 N.W.2d 137, 139 (Minn.1978); *see also State v. Dunkel,* 466 N.W.2d 425, 428 (Minn.App.1991) (following *Billups* in holding counseled pre-arrest, pre-Miranda silence may not be used for impeachment).[1]

Here, the prosecutor's single question strongly implied that Leja had "said nothing" to police upon her arrest in Mississippi. But Leja never answered the question, and the jury was instructed to disregard it. The general rule is that the jury must be presumed to have followed the trial court's instructions. *See State v. Pippitt,* 645 N.W.2d 87, 94 (Minn.2002). This is not a case of repeated questioning aimed at planting an improper inference. *See State v. Harris,* 521 N.W.2d 348, 352–53 n. 5 (Minn.1994) (questioning whether curative instruction would have prevented prejudice from repeated improper questioning). Rather, the prosecutor's question was brief, although, as the last question on cross-examination and one followed by a lengthy bench conference, it was not "undramatic." *Cf. Dunkel,* 466 N.W.2d at 429 (holding that brief, undramatic reference to defendant's pre-arrest silence was harmless beyond a reasonable doubt). But the jury had already heard abundant evidence of Leja's failure to cooperate with the police investigation into Holder's death. They had heard evidence that Leja denied knowing anything about Holder's body parts when she was first contacted by Wisconsin police, that she had not returned that officer's calls, and that she disclosed nothing to him even when he reached her at work. Given that the prosecutor did not persist in this line of ques-

---

1. The prosecutor did not contest defense counsel's assertion that Leja remained silent upon arrest on the advice of her attorney.

tioning and the trial court instructed the jury to disregard the question, we conclude that the prosecutor's brief question concerning Leja's silence when arrested in Mississippi was harmless beyond a reasonable doubt.

## II

■ Leja also argues that the trial court erred in failing to question the jury about its possible exposure to outside influences despite several occurrences of whispering in the courtroom and outbursts and conversation occurring in the hallway.

In reviewing a trial court's refusal to question jurors about outside influences, the reviewing court looks to whether the trial court properly determined that "serious questions of possible prejudice were not raised." *State v. Varner*, 643 N.W.2d 298, 306 (Minn.2002). Leja did not request the trial court to question the jury. But because the record confirms the possibility of outside influences and because the trial court has an independent duty to ensure that the jury is untainted, we do not apply the plain-error standard. *See generally State v. Richards*, 552 N.W.2d 197, 210 (Minn.1996).

The record indicates that at several points the trial court expressed concern about whispering and other distracting behavior occurring in the courtroom, and particularly in seats close to the jury, and about an outburst, as well as simple conversation occurring in the hallway. In response, the court instructed the jury to disregard anything of this nature that it heard either inside the courtroom or outside of it. The trial court also questioned a Wisconsin reporter who admitted talking to a juror on the first day of trial about parking, as well as other "chit-chat," and who identified himself to the juror as a reporter. The trial court directed the reporter not to talk to the jurors or to say

anything in a voice loud enough for them to hear.

While any private communication or contact with a juror is presumptively prejudicial, the only actual contact established in the record was the reporter's talking to a juror about parking and other "chit-chat." *See generally State v. Fields*, 529 N.W.2d 353, 357 (Minn.App.1995) (noting presumption of prejudice), *review denied* (Minn. Apr. 27, 1995). This contact did not come from a person in authority who was more likely to sway a jury, and we must presume that this contact was cured by the trial court's instructions to the jury to disregard any communications or overheard conversations. *See id.* Furthermore, the reporter's answers to the trial court's questions sufficiently rebutted the presumption that the contact was prejudicial.

## III

■ Leja next argues that the trial court abused its discretion in admitting the out-of-court statements of Holder concerning his sexual attraction to Leja and Darnell Smith's out-of-court statement, allegedly made in Leja's presence, that he was going to attack Holder. We disagree.

An appellate court will largely defer to the trial court's evidentiary rulings, which will be overturned only for a clear abuse of discretion. *State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). Here, the trial court admitted Holder's statements under the state-of-mind exception to the hearsay rule. Minn. R. Evid. 803(3).

With respect to Holder's statements, the trial court allowed Mauricio Jones to testify, over a defense objection, that after meeting Leja, Holder said he would like to have sex with her and that he could have sex with her. The trial court may admit

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as *intent, plan, motive, design* * * *) * * *.

Minn. R. Evid. 803(3) (emphasis added). Holder's statements were an expression of his intent or design to have sex with Leja, which was highly relevant to prove the state's theory that Holder was lured to his death by exploiting that intent. Therefore, the statements are an exception to the hearsay rule and the trial court did not clearly abuse its discretion in admitting them.

■ Leja also argues that the trial court abused its discretion in admitting Ramon Smith's testimony that at the conclusion of Leja's phone call with Holder, Darnell Smith asked him, in Leja's presence, to stay and help him beat up Holder. The trial court ruled that Smith's statement was admissible as non-hearsay because it was the statement of a co-conspirator made in furtherance of the conspiracy. Minn. R. Evid. 801(d)(2)(E). But this statement was also an expression of a plan or design and thus properly admitted under Minn. R. Evid. 803(3). Moreover, it appears that the statement was admitted not for its truth, but to show Leja's knowledge of Smith's plan. Therefore, the statement was not hearsay. *See* Minn. R. Evid. 801(c). Because we conclude that the statement was not hearsay and was admissible, we need not decide whether there was sufficient evidence that Leja was involved in a conspiracy making the statement admissible under Minn. R. Evid. 801(d)(2)(E). The trial court did not clearly abuse its discretion in admitting the statement.

## IV

■ Leja contends that she cannot be convicted of both aiding second-degree murder and being an accomplice-after-the-fact. She argues that because the accomplice liability imposed under Minn.Stat. § 609.05 for the first offense (second-degree murder) makes her a "principal" in the commission of that offense, she cannot also be guilty as an accomplice-after-the-fact. We agree.

This court construes a question of law, including the proper construction of a statute, de novo. *State v. Murphy,* 545 N.W.2d 909, 914 (Minn.1996).

The aiding an offender (accomplice-after-the-fact) statute imposes criminal liability on a person who

> harbors, conceals, or aids, another known by the actor to have committed a felony * * * with intent that such offender shall avoid or escape from arrest, trial, conviction, or punishment.

Minn.Stat. § 609.495, subd. 1(a) (2000). But as an accomplice in Holder's murder, Leja was already charged with aiding Darnell Smith.[2] And, under Minnesota law, Leja was charged as a principal in the second-degree murder offense because section 609.05 abolished the common law distinction between principals and accessories before the fact. Minn.Stat. Ann. § 609.05, advisory comm. cmt. (West 1987); *see generally State v. Grilli,* 304 Minn. 80–84, 230 N.W.2d 445, 449 (1975) (noting that if a person is liable for aiding and abetting under section 609.05, he is charged as a principal even though under the common law he would have been an accessory). Furthermore, the leading treatise on the defining of criminal offenses states: "A principal in either the

---

**2.** Pursuant to Minn.Stat. § 609.05, subd. 1 (2000), "[a] person is criminally liable for a crime committed by another if the person intentionally aids . . . the other to commit the crime."

first or second degree may not also become an accessory after the fact by his subsequent acts." 2 Wayne R. LaFave and Austin W. Scott, *Substantive Criminal Law*, § 6.9(a) at 169 (West 1986).

In sum, it is not possible, as a matter of law, for a principal to be guilty of being an accomplice-after-the-fact. Because Leja was found guilty as a principal on the second-degree murder charge, Leja's conviction as an accomplice-after-the-fact and the accompanying sentence must be vacated. In light of this conclusion, we need not address Leja's claim that the trial court should have given an instruction on the defense of necessity since Leja sought this instruction only on the count charging her as an accomplice-after-the-fact.

## V

■ Leja argues that the evidence is insufficient to prove that she aided Darnell Smith in the murder of Holder. We disagree.

In reviewing a claim of insufficient evidence, this court's review is limited to a painstaking analysis of the record to determine whether the evidence, viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach the verdict that they did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). We assume the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *State v. Alton*, 432 N.W.2d 754, 756 (Minn. 1988).

Leja's argument that her role in Holder's murder was limited to passive acquiescence and after-the-fact concealment ignores this court's standard of review. We must assume that the jury credited Ramon Smith's testimony that Darnell Smith, in Leja's presence, said he was going to beat up Holder. In addition, Ramon Smith testified that Leja was present when Darnell Smith was cleaning and loading his gun. Moreover, there is the undisputed evidence that Leja falsely told Holder that Darnell Smith was not home and invited him to the apartment. Lastly, after the murder, Leja and Parker drove to Wisconsin where they buried Holder's body parts on Leja's father's property at her suggestion. From this evidence the jury could reasonably conclude that Leja played a knowing and active role in the crime before its commission. *Cf. State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981) (reversing conviction for aiding and abetting of mother who did not actively encourage her son to murder his wife but merely passively acquiesced).

## VI

■ Finally, Leja argues that the trial court abused its discretion in its upward durational departure for the aiding second-degree murder conviction. We disagree.

The decision to depart from the presumptive sentence rests within the trial court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Givens*, 544 N.W.2d 774, 776 (Minn.1996).

The trial court imposed a sentence of 210 months for the aiding second-degree murder conviction, which represents a 60–month upward departure from the presumptive sentence of 150 months. The trial court cited the concealment of the victim's body and Leja's abuse of a position of trust as aggravating factors supporting the departure.

Leja argues that concealment of the victim's body may be used as an aggravating factor only when the defendant uses her knowledge of the location in attempting to bargain with authorities. *See State v. Schmit*, 329 N.W.2d 56, 58 n. 1 (Minn.1983) (holding concealment of body without bargaining attempt was not a proper aggravating factor). But the supreme court since *Schmit* has affirmed departures and cited concealment of the body even when there was no attempt to use the information for bargaining purposes. *See State v. Griller,* 583 N.W.2d 736, 744 n. 29 (Minn.1998); *State v. Folkers,* 581 N.W.2d 321, 327 (Minn.1998). We have held that, even in the absence of bargaining, "the method of concealment and the indication of particular cruelty may still be considered." *State v. Murr,* 443 N.W.2d 833, 836–37 (Minn. App.1989), *review denied* (Minn. Sept. 27, 1989). Here, the concealment of Holder's body parts, some of which were never recovered, was particularly cruel to Holder's family. We conclude that the trial court did not clearly abuse its discretion in imposing the 60–month upward departure. Because that departure is adequately supported by the aggravating factor of concealment of the body, we need not address Leja's argument that she was not in a position of trust as to Bobby Holder.

## DECISION

Leja is not entitled to a new trial because: (1) the prosecutor's question about Leja's post-arrest silence was harmless beyond a reasonable doubt; and (2) the district court properly admitted the out-of-court statements as hearsay exceptions and as non-hearsay, and sufficiently instructed the jury about outside influences. As a matter of law, however, Leja cannot be convicted of both aiding second-degree murder and as an accomplice-after-the-fact for the same offense. The latter conviction and the accompanying sentence must be vacated. The evidence, however, sufficiently supports the aiding second-degree murder conviction, and the trial court did not clearly abuse its discretion in its upward sentencing departure for that offense.

**Affirmed in part and vacated in part.**