**STATE of Minnesota, Respondent,**

v.

**Nancy Louise SPAIN, petitioner, Appellant.**

**No. C0–97–1268.**

Supreme Court of Minnesota.

Feb. 25, 1999.

---

John V. Norton, Oakdale, Clyde E. Miller, Jennings, DeWan, Miller & Anderson, P.A., Cambridge, for appellant.

Michael A. Hatch, Attorney General, St. Paul, James C. Backstrom, Dakota County Attorney, Scott A. Hersey, Asst. Dakota County Attorney, Hastings, for respondent.

Considered and decided by the court en banc without oral argument.

## OPINION

LANCASTER, J.

A Dakota County jury convicted appellant, Nancy Louise Spain, of first-degree arson.

The trial court sentenced appellant to 144 months, which constituted a triple durational departure from the presumptive sentence of 48 months set forth in the Minnesota Sentencing Guidelines. In an unpublished decision, the court of appeals affirmed. We granted appellant's petition for review for the limited purpose of reviewing the sentencing departure. We hold that the aggravating circumstances present in this case, while serious, do not justify a greater-than-double durational departure from the presumptive sentence and therefore reduce appellant's sentence to 96 months.

In July 1996, appellant's ex-husband, Eugene Letendre, allowed appellant to move into his South St. Paul home on a temporary basis after a rent increase forced her to move out of her apartment. While living in Letendre's home, appellant usually slept on the living room couch; when Letendre's and Spain's adult daughter was away, appellant would sometimes sleep in her bedroom. Letendre testified that during the few months that he allowed appellant to live in his home, he repeatedly rebuffed appellant's suggestions that he put her name on the deed to his house.

On the evening of October 5, 1996, Letendre drank beer with friends at a bar and then went to a restaurant for breakfast before returning home at about 2:40 a.m. When Letendre returned home, he did not see appellant sleeping on the living room couch, and he assumed that she was sleeping in their daughter's bedroom. Letendre retired to his bedroom and fell asleep.

A short time later, Letendre was awakened by his dog. He heard a "thud," as well as a "tinny" noise that sounded like tin cans falling on the floor. He immediately looked down the hallway and saw the appellant walking quickly toward the living room. Letendre also saw a 2–foot–high wall of flames that ran the length of his bed rising up from the hardwood floor.

Letendre attempted to smother the fire by throwing his bed comforter on the fire and stomping on it with his feet. As he tried unsuccessfully to extinguish the flames, he saw appellant standing in the living room, staring into his bedroom. Appellant then came running down the hallway, yelling that the house was on fire. Letendre told appellant to take his dog outside. He ran into the kitchen and dialed 911.

Firefighters subsequently arrived and extinguished the fire. Paramedics transported Letendre to a nearby hospital, where he was treated and then released the following day. In addition to experiencing some smoke inhalation, Letendre received burns to more than six percent of his body while trying to smother the fire. These "second degree, primarily superficial" burns were located on Letendre's feet, thighs, and the small finger of his left hand. These burns, described as "very painful" in the hospital's discharge summary, required the administration of morphine in the emergency room.

Fire investigators found a partially burned can of charcoal lighter fluid on Letendre's bedroom floor, and detected a burn pattern that ran along the side of Letendre's bed and along the foot of the bed. A forensic chemist from the Minnesota Bureau of Criminal Apprehension detected the presence of a chemical used in some charcoal lighter fluids after testing samples of the bedroom floor with a gas chromatograph.

A firefighter who saw appellant on the date of the fire noted that she was fully dressed, showed no signs of soot or smoke on her clothes, and was not coughing. The firefighter discovered that the living room couch was neatly made and did not look like it had been slept in. This conflicted with appellant's assertions to police and fire investigators that she had been asleep on the couch when the fire started and was awakened only after the presence of thick black smoke caused her to begin choking.

Appellant was subsequently arrested and charged with first-degree arson. Minn.Stat. § 609.561, subd. 1 (1998). The state argued at trial that appellant started the fire in Letendre's bedroom by pouring charcoal lighter fluid on the floor along his bed and then igniting it. Appellant asserted that Letendre caused the fire by falling asleep in bed with a lighted cigarette, thereby igniting some lighter fluid that he had previously spilled on the bedroom floor.

The state presented testimony from several witnesses who cast doubt on appellant's contention that Letendre accidentally started the fire. Letendre testified that the can of lighter fluid found in his bedroom was different than the brand he always bought, and that he did not keep lighter fluid inside his home. A fire investigator testified that he discovered a can of lighter fluid in Letendre's back yard near his barbecue.

South St. Paul firefighters and a private fire investigator testified that the burn pattern found on the bedroom floor indicated the fire had been set deliberately. A fire captain also testified that he was familiar with the brand of lighter fluid found in Letendre's bedroom, that its container would not empty if accidentally knocked over, and that a different pour pattern would have been found on the bedroom floor if the lighter fluid had accidentally spilled onto the floor.

The jury found appellant guilty of first-degree arson. In a victim impact statement presented to the court prior to sentencing, Letendre reported that the burns on his feet continued to affect his ability to work. Letendre stated that he is only able to stand for two or three hours before a "very bad burning feeling" in his feet forces him to sit down. Letendre also stated that he has been unable to get a full night's sleep since the fire, saying that he suffered from "flashbacks of [appellant] staring into my bedroom" while he struggled with the flames engulfing his bedroom. Letendre further stated that he suffered from "mental anguish" because he feared his ex-wife might still attempt to arrange for his murder.

The trial court sentenced appellant, who had no previous criminal history, to imprisonment of 144 months. This sentence constituted a triple durational departure from the 48–month presumptive sentence set forth in the sentencing guidelines. *See* Minnesota Sentencing Guidelines IV. (hereinafter MSG) (classifying first-degree arson a level VII offense); MSG V. (establishing presumptive sentence of 48 months for level VII offense committed by person with no criminal history). The trial court found the following aggravating circumstances justified this greater-than-double durational departure from the presumed sentence: (1) "[t]he offense was committed with premeditation and with a certain degree of stealth and planning"; (2) the offense was committed with "particular cruelty" to Letendre; (3) Letendre suffered serious physical injuries; (4) Letendre also suffered "significant emotional and psychological trauma"; (5) appellant's actions violated Letendre's zone of privacy and exploited the trust he had extended to her; and (6) Letendre's alcohol consumption had left him particularly vulnerable at the time of the offense.

In an unpublished decision, the court of appeals affirmed this sentence, concluding that the trial court did not abuse its discretion by finding these six aggravating factors and imposing a triple durational departure. *State v. Spain*, No. C0–97–1268, 1998 WL 217193 (Minn.App.1998). On appeal, Spain contends that the trial court abused its discretion by imposing a greater-than-double durational sentencing departure in the absence of severe aggravating circumstances.

We afford the trial court great discretion in the imposition of sentences and we cannot simply substitute our judgment for that of the trial court. *See State v. Murphy*, 545 N.W.2d 909, 916 (Minn.1996). A trial court's decision to depart from the presumptive sentence specified in the sentencing guidelines is reviewed for an abuse of discretion. *See Rairdon v. State*, 557 N.W.2d 318, 326 (Minn.1996).

The purposes of the sentencing guidelines will not be served if the trial courts generally fail to apply the presumptive sentences found in the guidelines. *See State v. Garcia*, 302 N.W.2d 643, 647 (Minn.1981). In fact, a sentencing court has no discretion to depart from the sentencing guidelines unless aggravating or mitigating factors are present. *See State v. Best*, 449 N.W.2d 426, 427 (Minn.1989).

The aggravating or mitigating circumstances justifying departure from the presumptive sentence must be present in the record. *See Rairdon*, 557 N.W.2d at 326. When considering whether these factors are present, the sentencing court "should consid-

er whether the defendant's conduct was 'significantly more or less serious than that typically involved in the commission of the crime in question.'" *Id.* (quoting *State v. Back,* 341 N.W.2d 273, 276 (Minn.1983)). The list of potentially aggravating or mitigating factors is non-exclusive. *See* MSG Comment II.D.201.

When a sentencing court departs from the presumptive sentence, it must still strive to determine a sentence that is proportional to the severity of the offense. *See* MSG II.D. As a general rule, the maximum upward departure in sentence length that can be justified by aggravating circumstances is a double durational departure from the presumptive sentence. *See State v. Evans,* 311 N.W.2d 481, 483 (Minn.1981). However, if severe aggravating circumstances are present, the double durational departure limit does not apply. *See Murphy,* 545 N.W.2d at 917 (citing *Evans,* 311 N.W.2d at 483 (stating "there may well be rare cases in which the facts are so unusually compelling that an even greater degree of departure will be justified")).

Appellant does not contest that the factors cited by the court at sentencing can constitute aggravating circumstances. Instead, appellant argues that the magnitude of the durational departure imposed by the court is disproportional to the severity of her conduct.

When we review a sentencing court's imposition of a durational departure that more than doubles the presumptive sentence specified by the sentencing guidelines, we are mindful that no bright-line rule marks the boundary between the "aggravating circumstances" justifying a double durational departure and the "severe aggravating circumstances" justifying a greater-than-double durational departure. *See State v. Norton,* 328 N.W.2d 142, 146–47 (Minn.1982). Still, we also bear in mind that the circumstances justifying a departure that more than dou-

bles a presumptive sentence are extremely rare. *See Rairdon,* 557 N.W.2d at 327. In addition, we are influenced by the knowledge that the aims of the sentencing guidelines, to achieve sentencing uniformity and to keep prison population levels manageable, might be defeated if sentencing departures which more than double the presumptive sentences set forth in the guidelines are allowed too liberally. *See Perkins v. State,* 559 N.W.2d 678, 692 (Minn.1997) (quoting *Norton,* 328 N.W.2d at 147).

In the end, our assessment of the severity of the aggravating circumstances present in this case "must be based on our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *Murphy,* 545 N.W.2d at 917 (quoting *Norton,* 328 N.W.2d at 146–47). After carefully reviewing this case and comparing the sentence imposed with sentences imposed in other cases, we conclude that the extent of the sentencing departure imposed here was not justified.

We are particularly concerned that appellant's 144–month sentence approaches the 180–month presumptive sentence for defendants with a criminal history score of zero for first-degree attempted murder, and is nearly double the 75–month presumptive sentence for second-degree attempted murder.[1] *See* MSG V.; MSG II.G. The 144–month sentence also closely approximates the 150–month presumptive sentence available for offenders with no criminal history, such as appellant, who commit second-degree murder. *See* MSG V. Perhaps the state could successfully have prosecuted appellant for a more serious crime, such as first-degree attempted murder. However, it did not attempt to do so. Accordingly, we are troubled by a sentence that effectively punishes appellant as if she had been tried and convicted of first-degree attempted murder.

We do not wish to imply that the trial court in this case used the triple durational

---

1. One of our first decisions reviewing the acceptable scope of durational departures under the sentencing guidelines was the 1981 case of *State v. Evans,* 311 N.W.2d 481, 483 (Minn.1981) (establishing general rule that the permissible upper limit on durational departures is double the pre-

sumptive sentence length). In *Evans,* our determination that a sentencing departure was excessive was based in part on our comparison of the defendant's sentence to the presumptive sentences available under the guidelines for other offenses. *Id.* at 483.

departure as a means of punishing appellant for attempting to murder Letendre. *See State v. Simon*, 520 N.W.2d 393, 394 (Minn. 1994) (stating "the state should not be able to use the fact that it might have been able to obtain a conviction of a greater offense—e.g., attempted murder—to support [a sentencing] departure"). Clearly, appellant's conduct was egregious, from the calculating manner with which she committed the crime, to the serious physical and psychological injuries she caused that continue to afflict the victim. Damage to a dwelling is an element of Minn. Stat. § 609.561, subd. 1, and first-degree arson is by definition the most serious type of arson. Even so, appellant committed the offense in a particularly serious way. Nonetheless, we conclude that imposition of a 144–month sentence in this matter would be inconsistent with the primary purpose of the sentencing guidelines, which is to ensure that sentences are "proportional to the severity of the offense of conviction and the extent of the offender's criminal history." MSG I.

We hold that a 144–month sentence is disproportional to the severity of appellant's conduct. We therefore modify appellant's sentence to 96 months, which constitutes a double durational departure from the presumptive sentence set forth in the sentencing guidelines.

Affirmed as modified.