STATE of Minnesota, Respondent,

v.

Tina DeAnn LEJA, Appellant.

No. C9–02–863.

Supreme Court of Minnesota.

July 29, 2004.

Michael F. Cromett, Office of the State Public Defender, Minneapolis, for Respondent.

Michael Hatch, State Attorney General, St. Paul, Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Minneapolis, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Tina DeAnn Leja challenges her 210-month sentence for second-degree felony murder. The court of appeals concluded that the district court did not abuse its discretion when it departed upward from the 150-month presumptive sentence established by the Minnesota Sentencing Guidelines. Because we conclude that Leja did not commit the underlying offense of second-degree felony murder in a particularly serious way, we reverse and modify Leja's sentence to the presumptive sentence of 150 months.

We begin by recognizing that the murder of Bobby Dee Holder was particularly gruesome. With little or no provocation, Darnell Smith and his younger brother Chaka assaulted and murdered Holder in Darnell's residence and then dismembered his body. Darnell then directed Andre Parker and appellant Tina DeAnn Leja to dispose of Holder's body parts. For his central involvement in Holder's murder, Darnell Smith was tried and convicted of first-degree premeditated murder and was sentenced to imprisonment for life without the possibility of release. In September 2003, we upheld Darnell Smith's conviction for first-degree premeditated murder. *State v. Smith,* 669 N.W.2d 19, 30, 35 (Minn.2003). Chaka Smith pleaded guilty to second-degree felony murder and was sentenced to 20 years imprisonment. Andre Parker cooperated with the authorities, pleaded guilty to aiding an offender after the fact, and was sentenced to 5 years imprisonment.

Leja was Darnell's girlfriend and the person who invited Holder to Darnell's residence on the evening of the murder. At Darnell's direction, two days after the murder she helped dispose of Holder's body parts. Based on this conduct, Leja was tried and convicted of second-degree felony murder and was sentenced to 210 months, or 17 and one-half years imprisonment. The sentence Leja received represented an upward departure of 60 months, or 5 years, from the presumptive sentence for second-degree felony murder. The question presented by this appeal is whether, under the Minnesota Sentencing Guidelines, Leja's conduct justifies this upward sentencing departure of 60 months.

Leja met Darnell Smith in 1998 while she was employed as a guard at the Stillwater State Prison where Smith was serving a sentence for criminal sexual conduct with a child. Leja and Smith developed a prohibited romantic relationship and, as a result, Leja's employment was terminated

in October 1999. After termination of her employment, Leja continued her relationship with Smith by writing him love letters while he served the remainder of his sentence. After Smith's release in May 2001, the relationship continued, but took a turn for the worse, with Smith controlling, beating, and humiliating Leja.

In late June 2001, Holder arranged to sell some tire rims to Smith. Holder and his friend Mauricio Jones then met Leja in a McDonald's parking lot, where Leja paid for the rims. Jones testified that on the way to McDonald's, Holder stated "he would like to have sex with [Leja]." While Leja was meeting with Holder, Smith talked to Holder on Leja's cell phone, insisting that Holder install the rims on his car. Jones testified that Holder did not say anything sexual while he was in Leja's presence, but that on the way back from McDonald's, Holder said "he could have sex with her." Leja testified that she was not interested in Holder, did not flirt with him, and that Holder did not express an interest in her. Jones also testified that Holder was nervous about being around Smith and did not trust him. While at Smith's residence later that same evening, Holder started to install the rims, but did not finish because he needed some other tools.

On July 5, Leja visited a girlfriend and talked about her troubled relationship with Smith. Leja subsequently went to Smith's residence after being told by Smith that she was supposed to be there. Smith became angry at Leja for visiting her friend, took her car keys, and ordered her onto the bed. Leja testified that Smith then hit her with an alarm clock, which caused her to bleed. As was his standard practice, Smith took Leja's cell phone, checked it for incoming calls, and questioned her about the source of certain calls she had received, including one from Holder. Leja lied to Smith, telling him that Holder's number was a wrong number. For the next hour, Smith forced Leja to remain on the bed. When Holder subsequently called Leja's cell phone, Smith gave the phone back to Leja to answer. Leja testified that Holder was calling Leja to say that he wanted to pick up some tools he had left at Smith's residence.

The state's key witnesses to the subsequent events of July 5 were Smith's younger brother Ramon and Ramon's girlfriend, Katrina Valley. Ramon and Valley testified that they drove to Smith's residence around 9:30 or 10:00 p.m. They entered the residence and were present in Smith's bedroom when Leja received the call from Holder. Valley testified that she saw Leja in the bedroom and saw Smith sitting on the bed cleaning a handgun. According to Valley, when Leja received the call from Holder, Smith "scooted up behind" Leja and whispered in her ear, "Tell him I don't live here. That this is your house." Valley then heard Leja tell Holder, "He's not here right now. You can come over." Valley testified that Leja appeared nervous. Valley stated that shortly after this telephone call, she and Ramon left the residence.

Ramon testified that when he entered Smith's bedroom, Leja was talking on her cell phone. Ramon testified that he saw Smith whispering in Leja's ear as she talked on the phone, and heard Leja telling the caller, "He's not here. This is my house. You can come over now." Ramon also testified that Smith said that he wanted Holder to come over because he thought Holder wanted to have sex with Leja and that he used Leja to lure Holder to the residence. Ramon testified that Smith did not say that Leja lured Holder to come over with the promise of sexual favors. Both Ramon and Valley said that

Smith was holding, cleaning, or loading a large handgun during the call.

Ramon stated that after the call from Holder, Smith told him, in the presence of Leja and Valley, "That was the guy that was putting on my rims. I want you to stay here and help me fuck him up"—meaning fight him. According to Ramon, Leja heard this request and had no reaction to it. But Valley testified that she personally never heard Smith ask Ramon to help with a fight. Ramon testified that he and Valley then "staged an argument" in order to get out of the situation.

Holder subsequently arrived at the residence where Smith's bedroom was located. Leja greeted him at the front door, while Smith and his younger brother Chaka, who had arrived shortly before, hid from Holder. After Holder entered Smith's bedroom to retrieve his tools, Smith came into the bedroom, grabbed Holder, and he and Chaka began hitting him. Leja testified that Holder struggled, making it to the front door of the residence, but then she heard two shots, and saw the two men drag Holder's body into the bedroom. Leja testified that she witnessed Holder's murder, but did not participate in it. Rather, she said that she was curled up in a ball on the bed when the shooting took place and was crying. She testified that she fell asleep with Holder's body still lying on the floor of Smith's bedroom. Ramon testified that Smith told him that after Holder had died, Chaka held Holder's body while Smith cut it up. Leja testified that she did not know how Chaka happened to be at the residence at the time of the murder.

The state's key witness with respect to the disposal of Holder's body parts was Andre Parker. While Parker was getting a cigarette from Smith on July 6, Smith showed him Holder's body parts which were stored in a cooler. According to Parker, Smith put his hand on a gun which was tucked in his waistband and told Parker he wanted him to help get rid of the body. Parker testified that he was afraid that Smith would kill him if he did not comply with Smith's directive. After an unsuccessful attempt to find a disposal site for the body in Saint Paul, Smith had Parker help him put the cooler containing Holder's body parts into Leja's car.

The next day, July 7, Smith told Leja to get rid of Holder's body and that Parker would be watching her. Parker testified that while they were preparing to dispose of the body, Smith would not let Leja get too far out of his sight and that Leja was often crying. In a videotaped statement made to the police, Parker said the following when asked about the scene when Smith showed him the body parts in the cooler:

Q: Was Tina there? How did she look?

A: Very well dressed, makeup done, all that shit, and still looked like she wanted to fuckin' throw up. Even though she was well groomed and all that she looked like she wanted to jump out of her fuckin' skin. Then I guess by the time she figured out that he had brought me into this shit she wanted to fuckin' cry. As soon as we got a little second alone she was like, "I can't believe they did, that he got you in this shit."

Smith told Parker to drive Holder's car and follow Leja, who would be driving her own car. Parker and Leja then set off for Wisconsin, where they left Holder's car at a park-and-ride lot in western Wisconsin. Parker testified that after abandoning Holder's car, he got into Leja's car and they drove together to her father's Wisconsin farm. Along the way, Leja described how Smith had "forced her to manipulate him, Mr. Holder, into coming to his residence," and how Smith had assault-

ed and then shot Holder. Parker testified that Leja cried for a while before she told Parker what had happened.

Leja corroborated much of Parker's testimony about the drive to Wisconsin. Leja testified that she and Parker drove to her father's farm to dispose of Holder's body. Once there, they attempted to bury Holder's torso. Leja said that she picked a spot close to the house so that her father would discover the torso. In fact, her father discovered Holder's torso the next day. Parker testified that Leja was crying when they buried Holder's torso. Leja testified that she disturbed things in the garage and left hair and fingerprints so that it was obvious that she had been at the farm.

After burying Holder's torso on the farm, Leja and Parker drove north to Superior, Wisconsin, and returned to Minnesota by way of Duluth, and then drove south on Interstate 35. At Parker's direction, Leja exited the interstate when they were 50 or 60 miles south of the Black Bear Casino, which is located in Carlton, Minnesota, a town about 20 miles south of Duluth. After heading east for less than one mile, Parker exited the car and cut the fingers off of Holder's hands. The two then continued driving until they reached a driveway on a dirt road located in a wooded area. At this point, Parker exited the car again and threw Holder's remaining body parts into the woods. Parker and Leja subsequently returned to Leja's Woodbury, Minnesota residence, cleaned the car, and then showered. When asked about Leja's reaction when they were disposing of Holder's body parts, Parker made the following statement to police:

This bitch is shook. (imitating Tina crying) This bitch is fucking shaking like a leaf. You (inaudible) cigarettes. We (inaudible) to do all this. I bet you (inaudible) at least 200 mother fuckin' cigarettes flew by until we finally [got] to that fuckin' house. By the time we got (inaudible). We had to stop and buy some more fuckin' cigarettes and we had already smoked about five or six packs between two people. She was shook, she cried the whole fuckin' time here. (imitating Tina crying and talking). I don't believe this, I don't know why he did this, it wasn't suppose to be like this. (inaudible) he doesn't love me, I thought he (inaudible). (inaudible) mother fuckin' kill me (inaudible).

About ten days later, on or around July 17, Leja contacted an old boyfriend who lived in Montana and she and Smith eventually drove to Montana, staying with the friend for half a day. Leja told her friend that she was afraid, and as Leja hoped, her friend suspected something was wrong, did some checking on the internet, and called the police the next day. After returning to Saint Paul, Smith decided to go to Mississippi for a funeral and took Leja with him.

In August, Smith and Leja were arrested by police in Mississippi and returned to Minnesota to stand trial. Smith was charged with first-degree murder, tried by a jury, found guilty, convicted, and sentenced to imprisonment for life without the possibility of release. Chaka Smith was also arrested for the murder and he pleaded guilty to second-degree felony murder and was sentenced to 20 years imprisonment.

Based on her involvement with Holder's murder, Leja was charged with second-degree felony murder, accomplice-after-the-fact, second-degree assault, and conspiracy to commit second-degree assault. At trial, Leja admitted that she did not warn Holder that Smith was angry, nor did she ask Smith or his brother Chaka to stop assaulting Holder, testifying that she

was "paralyzed." Neither did she call the police on the trip to Wisconsin, although she had a cell phone and was at some point alone in her car. Leja admitted that she did not tell her family about her knowledge of Holder's body parts and that she lied to police when they questioned her.

At the close of her trial, Leja requested instructions on both duress and necessity. She argued that there was evidence from which the jury could conclude that she was under duress from Smith on July 5, 2001, and that her actions two days later in helping dispose of Holder's body were justified by necessity. The district court instructed the jury on the defense of duress, but declined to give an instruction on necessity.

The jury found Leja guilty of second-degree felony murder, accomplice-after-the-fact, and second-degree assault, and the district court entered convictions on all three counts. The court then imposed a sentence of 210 months for the second-degree felony murder conviction, an upward durational departure of 60 months from the presumptive sentence. The court cited the concealment of Holder's body and Leja's "abuse of a position of trust" as aggravating factors supporting the departure. The court also imposed a consecutive, although stayed, sentence of 81 months for the accomplice-after-the-fact conviction.

Leja appealed all three convictions, as well as the upward sentencing departure associated with the second-degree felony murder conviction. *State v. Leja,* 660 N.W.2d 459 (Minn.App.2003). The court of appeals vacated the accomplice-after-the-fact conviction. The court held that because the accomplice liability imposed under Minn.Stat. § 609.05 for the first offense—second-degree felony murder—makes Leja a principal in the commission of that offense, she cannot also be guilty as an accomplice-after-the-fact. *Leja,* 660 N.W.2d at 465, 467. The court affirmed both the second-degree felony murder conviction and the upward durational departure. *Id.* at 466–67.[1] The court held that, because the departure "is adequately supported by the aggravating factor of concealment of the body," it did not need to reach Leja's argument that she was not in a position of trust as to Holder. *Id.* at 467.

Leja petitioned this court for further review of (1) the second-degree felony murder conviction; (2) the assault in the second-degree conviction; and (3) the upward durational departure for the second-degree felony murder conviction. We granted review as to the upward durational departure issue only. While the state advanced "abuse of position of trust" as an aggravating factor at sentencing, it did not maintain that position either in the court of appeals or in this court. Therefore, the only issue before us is whether under the Minnesota Sentencing Guidelines, Leja's aiding in the concealment of Holder's body parts provides an adequate ground to support the district court's determination to depart upward.[2]

---

1. Although raised in Leja's brief to the court of appeals, that court apparently did not address the conviction for aiding assault in the second degree. *See State v. Leja,* 660 N.W.2d 459 (Minn.App.2003).

2. In *Apprendi v. New Jersey,* the United States Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). On June 24, 2004, after we heard oral argument in the present case, the Court held in *Blakely v. Washington* that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts re-

■ The purpose of the Minnesota Sentencing Guidelines is to establish rational and consistent standards in order to reduce sentencing disparity. Minnesota Sentencing Guidelines I. The Guidelines seek to ensure that sanctions following conviction of a felony are proportional to the severity of the offense of conviction and the extent of the offender's criminal history. *Id.* Minnesota Sentencing Guidelines II.D.2(b) sets forth "a nonexclusive list of reasons which may be used as reasons for departure." Minnesota Sentencing Guidelines cmt. II.D.201; *State v. Spain*, 590 N.W.2d 85, 89 (Minn.1999). The reasons for departure from the guidelines "are intended to describe specific situations involving only a small number of cases." *State v. Schantzen*, 308 N.W.2d 484, 487 (Minn.1981). Despite the fact that the list of factors is nonexclusive, "[t]he purposes of the sentencing guidelines will not be served if the trial courts generally fail to apply the presumptive sentences found in the guidelines." *Spain*, 590 N.W.2d at 88.

■ We have said that "[t]he general issue that faces a sentencing court in deciding whether to depart durationally is whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Cox*, 343 N.W.2d 641, 643 (Minn.1984). We review departures from presumptive sentences "under an abuse of discretion standard, but there must be 'substantial and compelling circumstances' in the record to justify a departure." *State v. Griller*, 583 N.W.2d 736, 744 (Minn.1998) (quoting *Rairdon v. State*, 557 N.W.2d 318, 326 (Minn.1996));

Minnesota Sentencing Guidelines I(4). "This court has discretion in individual cases to modify the sentences of an appealing defendant if that appears to be in the interests of fairness and uniformity." *State v. Vazquez*, 330 N.W.2d 110, 112 (Minn.1983); Minn.Stat. § 244.11, subd. 2(b) (2002).

The state argues that *State v. Ming Sen Shiue*, 326 N.W.2d 648 (Minn.1982), holds that concealment of a body alone is an aggravating factor sufficient to justify an upward durational departure. In *Shiue*, we noted that the district court cited six grounds for departure. *Id.* at 654. We "particularly note[d] that the concealment was an aggravating factor to be considered," but also noted that "[c]oncealment has never been considered by this court as an aggravating factor. It has been found to be an appropriate consideration in other jurisdictions" and "is appropriate here." *Id.* at 655. The *Shiue* court particularly focused on the fact that Shiue "negotiated an agreement to disclose the whereabouts of the body in exchange for an agreement to forego prosecution for first degree murder." *Id.*

Less than two months after the *Shiue* decision was handed down, we decided *State v. Schmit*, 329 N.W.2d 56 (Minn. 1983). In a footnote in *Schmit*, we said:

> In justifying its departure in sentencing, the trial court relied, in part, upon the manner in which defendant disposed of the victim's body. Because defendant made no effort to bargain with information concerning the location of the body, his concealment of the body does not

flected in the jury verdict or admitted by the defendant." —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403, 2004 WL 1402697 (2004). Although *Blakely* was decided after oral argument in this case, *Apprendi* has been the law of the land since 2000. Nevertheless, Leja

has not challenged her sentence on *Apprendi* grounds and has thus waived any such objection. Accordingly, we decide this case on the basis of established Minnesota sentencing jurisprudence and not based on the principles articulated in *Apprendi/Blakely*.

operate as an aggravating factor in sentencing.

*Id.* at 58 n. 1. Leja contends that the *Schmit* footnote provides that concealment of the body is not an aggravating factor when the defendant makes no effort to bargain with information concerning the location of the body. The state argues that this footnote was dicta and thus not essential to the determination of *Schmit,* as other aggravating factors were recognized as sufficient to support the double upward durational departure in that case.

After the *Schmit* decision, it was not until 1998 that we reviewed another sentence departure involving concealment of a body as an aggravating factor. In *State v. Folkers* and *State v. Griller,* we affirmed sentencing departures based in part on the fact that the defendant had concealed the murder victim's body—even though in both cases there had been no effort to use the body's location to negotiate a more favorable charge. *Folkers,* 581 N.W.2d 321, 327 (Minn.1998); *Griller,* 583 N.W.2d at 744 n. 9. In both decisions, we cited *Shiue,* but not *Schmit.* In its decision below, the court of appeals noted that since *Schmit,* we have "affirmed departures and cited concealment of the body even where there was no attempt to use the information for bargaining purposes." *Leja,* 660 N.W.2d at 467 (citing *Griller* and *Folkers* ). We note, however, that the upward durational departures in both *Folkers* and *Griller* were based on *multiple* aggravating factors, of which concealment of the body was but a single factor. We have not decided a case where concealment, standing alone, was cited approvingly as a sufficient aggravating factor supporting an upward departure. Additionally, in both *Folkers* and *Griller,* the defendant who concealed the body was the same person who committed the underlying murder.

In *Shiue,* we concluded that the use of concealment as an aggravating factor is justified by two reasons—trauma to close relatives and independent policy concerns. *Shiue,* 326 N.W.2d at 655. Regarding the policy concerns, we expressed the concern that if concealment was not considered an aggravating factor, the accused would be able to use the concern of the victim's family to negotiate a favorable plea agreement in return for disclosing the location of the victim's body. *Id.* These independent policy concerns are not present here. There is no evidence in the record that Leja attempted to bargain with the authorities using her knowledge of where Holder's body was buried.

The aggravating factor of particular cruelty looks to whether "[t]he victim was treated with particular cruelty for which the *individual offender* should be held responsible." Minnesota Sentencing Guidelines II.D.2(b)(2) (emphasis added). Here, it is undisputed that Leja was more than an innocent bystander. But she was not the person who assaulted and shot Holder or dismembered his body. Unquestionably, Holder's murder was a gruesome crime and there can be no dispute that as a result Holder and his family were treated with particular cruelty. However, that cruelty was meted out by the Smith brothers, not Leja. Darnell Smith hit Holder with the flashlight. Chaka Smith blocked Holder's means of escape by standing in the doorway and putting his hands on the walls. Darnell Smith shot Holder and ignored his pleas for mercy. Both Smith brothers dismembered Holder's body, and it was Darnell who directed Parker and Leja to conceal Holder's body. There is no evidence in the record which suggests that when Leja lured Holder to Smith's residence, she knew that Holder would be murdered, let alone that she would be directed to conceal his body. There is no

evidence in the record that Leja felt any ill-will toward Holder or intended to bring about his demise.

■ As we analyze the specific facts of this case, we are especially mindful that the standard for departure requires that the aggravating factors be "substantial and compelling." *Griller,* 583 N.W.2d at 744. Substantial and compelling circumstances are those which demonstrate that the "defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question." *Cox,* 343 N.W.2d at 643. Here, it is critical that we specifically focus on Leja's conduct and her second-degree felony murder sentence and not be unduly distracted by the conduct of the Smith brothers. While reprehensible and regrettable, we conclude that Leja's actions fail to reach the threshold of substantial and compelling circumstances needed to justify an upward durational departure. The sentencing guidelines lose all meaning if this standard is not adhered to by the district courts. *See Spain,* 590 N.W.2d at 88.

■ Based on the facts of this case, we cannot conclude that Leja's conduct constituted anything other than a typical offense of second-degree felony murder. We are mindful of the fact that typical does not mean minimal. It is quite possible that a typical offense, were we able to define it, would involve conduct much more extreme than the minimum conduct required to violate the applicable statute. Regardless, we conclude that a sentence of 210 months, or 17 and one-half years, is disproportionate to the offense that Leja

committed. *See State v. Norris,* 428 N.W.2d 61, 71 (Minn.1988) (holding that the sentence imposed by the district court unduly exaggerated the criminality of defendant's conduct). Leja's participation in the concealment of Holder's remains, without more such as her bargaining with the authorities, does not support an upward durational departure. *See Shiue,* 326 N.W.2d at 655. Therefore, we hold that the district court abused its discretion when it departed upward from the presumptive sentence established by the Minnesota Sentencing Guidelines. Accordingly, we reduce Leja's sentence to 150 months, the presumptive sentence for second-degree felony murder.

Affirmed as modified.

ANDERSON, Russell A., Justice (concurring specially).

I concur in the result, but write separately to express my view of sentencing guidelines principles that support the majority's conclusion that the district court abused its discretion by departing upward from the 150–month presumptive sentence for aiding and abetting second-degree felony murder.

Tina Leja was charged with and convicted of unintentional felony murder, with second-degree assault as the underlying felony. Specifically, she was convicted of intentionally aiding and abetting Darnell Smith in the assault, with the death of Bobby Holder a foreseeable consequence of the assault, but without intent to kill Holder. *See* Minn.Stat. §§ 609.05, subds. 1, 2; 609.19, subd. 2(1) (2002).[1] Leja was

---

1. Minn.Stat. § 609.05, subd. 1 provides that "[a] person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Subdivision 2 provides that a person liable under subdivision 1 "is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended." The amended complaint alternatively charged Leja with "acting alone," but there is no evidence that she did

also charged with and convicted of accessory after the fact; specifically, that she intentionally aided Darnell Smith, a person known by her to have committed a criminal act, "by destroying or concealing evidence of that crime, providing false or misleading information about the crime, or by obstructing the investigation or prosecution of the crime." *See* Minn.Stat. § 609.495, subd. 3 (2002).[2]

At sentencing the district court concluded that the conviction for accessory after the fact could be sentenced separately because that offense was "not part of the same behavioral incident as the murder," and because the offense of accessory after the fact involved "a different motivational factor, a new element * * * separated by time, place and motive." Indeed, Leja's misconduct in concealing the victim's dismembered body occurred two days after the murder and was, in the words of the district court, "separated by time, place and motive" from the murder. *See State v. Johnson*, 273 Minn. 394, 404, 141 N.W.2d 517, 525 (1966) (in determining whether intentional crimes are committed in a single behavioral incident, factors to be considered are time, place, and "whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective.").

I agree with the district court's finding that the act of concealing the victim's dismembered body two days after the murder was a different behavioral incident "separated by time, place and motive" from the murder; in fact, if the offense of accessory after the fact were a part of the same behavioral incident as the second-degree felony murder, the district court would

have been prohibited from entering convictions for, and sentencing, both offenses. Minn.Stat. § 609.035, subd. 1 (2002) (providing that with certain exceptions, "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses.").

The court of appeals vacated the conviction and sentence for the offense of accessory after the fact, holding that as a matter of law, accomplice liability imposed under Minn.Stat. § 609.05 for the second-degree felony murder made Leja a principal in the commission of that offense, and that she therefore could not also be guilty as an accessory after the fact. *State v. Leja*, 660 N.W.2d 459, 465, 467 (Minn. App.2003). We did not grant review of that holding by the court of appeals and thus the law of the case is that Leja cannot be convicted or sentenced for the offense of accessory after the fact arising out of the separate behavioral incident of concealment of the victim's body. In my view, when, as a matter of law, the district court cannot convict or sentence for misconduct arising from a distinct behavioral incident, the court cannot rely upon such misconduct to enhance a sentence for a different offense, arising out of a separate behavioral incident.

We have stated that the district court "may not rely on conduct underlying one conviction to support departure on a sentence for a separate conviction." *State v. Williams*, 608 N.W.2d 837, 840 (Minn. 2000). *Accord State v. Richardson*, 670 N.W.2d 267, 285 (Minn.2003) ("For each offense, there must be substantial and compelling reasons to depart from the

---

so or took any part in the act of assaulting Holder.

**2.** Subdivision 3 of the statute, creating the separate crime of accomplice after the fact,

was enacted in 1993, after the *Ming Sen Shiue* and *Schmit* cases were decided. Act of May 20, 1993, ch. 326, art. 4, § 25, 1993 Minn. Laws 2037.

Minnesota Sentencing Guidelines' presumptive sentence."). We have also recognized that durational departures ordinarily should be confined to consideration of the conduct and surrounding circumstances that provide the basis for the offense of conviction, and should not be based on evidence that points to the defendant's guilt of an offense that was never charged or if charged, was dismissed. *State v. Womack,* 319 N.W.2d 17, 19–20 (Minn. 1982); *State v. Misquadace,* 644 N.W.2d 65, 68 (Minn.2002). For evidence of another offense to be considered for a durational departure, the other offense must show that the defendant committed the offense being sentenced in a particularly serious way. As we stated in *State v. Cox,* 343 N.W.2d 641 (Minn.1984):

> The general issue that faces a sentencing court in deciding whether to depart durationally is whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question. In making this determination the court may not consider evidence that points to the defendant's guilt of some other offense but that does not support the conclusion that the defendant committed the offense in question in a particularly serious way.

*Id.* at 643.

Leja's concealment of Holder's body constitutes the separate offense of accomplice after the fact. The fact she and Andre Parker disposed of Holder's body parts in various locations in two states, some of them never to be found, may have supported an upward durational departure for that offense. However, the fact of

concealment and the manner in which it was done does not show that Leja's aiding and abetting unintentional felony murder was committed in a particularly serious way. The state charged Leja with aiding and abetting second-degree felony murder and accomplice after the fact, and the court of appeals ruled that both convictions could not stand. The felony murder conviction carried a presumptive sentence of 150 months in prison, approximately the same term the trial court could have imposed for accomplice after the fact had it found the manner of concealment of the body a justifiable basis for a durational departure.[3]

As an accomplice, Leja is viewed by the law as equally culpable for the crime of which she was convicted, second-degree felony murder, as the individuals who actually committed the assault and murder. As such, she faced the presumptive sentence for that offense, the same as they would have had they been convicted of that offense. But when it comes to deciding whether to durationally depart from the presumptive sentence, each participant's conduct in relation to the crime is individually examined. As the majority points out, the murder here was particularly gruesome, and Darnell Smith was appropriately convicted of first-degree premeditated murder. *State v. Smith,* 669 N.W.2d 19, 30 (Minn.2003). But the murderous assault of Holder and the dismemberment of his body were not the acts of Leja. She also was not convicted of aiding and abetting either premeditated or intentional murder, and cannot be sentenced for those offenses. In other words, the premeditated and intentional acts of Darnell Smith, the principal actor, cannot form the basis

---

**3.** Accomplice after the fact is an unranked offense under the sentencing guidelines. The trial court determined to rank it at what was then severity level eight and imposed the presumptive 81–month term. "[G]enerally in a case in which an upward departure in sentence length is justified, the upper limit will be double the presumptive sentence length." *State v. Evans,* 311 N.W.2d 481, 483 (Minn. 1981) (emphasis deleted).

for enhancing the sentence of Leja, who was convicted of conduct which aided and abetted the assault causing Holder's death, without intent to kill him.[4]

On appeal, the state abandoned its contention that Leja's act of luring Holder to the residence was so egregious as to support an upward departure, and we are left with nothing else to show that Leja's conduct was significantly more serious than that typically involved in aiding and abetting an unintentional felony murder. Acts of aiding and abetting create accomplice liability for a crime and subject the accomplice to the same sentence as if he or she actually committed it. Facts already taken into account by the legislature in determining the degree or seriousness of the offense are inappropriate bases for a departure. *See, e.g., Taylor v. State,* 670 N.W.2d 584, 589 (Minn.2003). Unless those acts of aiding and abetting are so egregious as to warrant a departure, the presumptive sentence must be imposed.

BLATZ, Chief Justice (dissenting).

Because I disagree with the majority's conclusion that the trial court abused its discretion in imposing a limited upward durational departure, I respectfully dissent.[1] Tina Leja was convicted of second-degree felony murder. The murder, as acknowledged by the majority, was "particularly gruesome." However, in concluding that a limited upward departure was not justified, the majority later describes Leja's conduct as nothing "other than a *typical* offense of second-degree felony murder." (Emphasis added.) I cannot agree.

Leja was in love with Darnell Smith. As a prison guard, she violated known employment rules and began a romantic relationship with him while he was an inmate, stating that she "chose" to begin a relationship with Smith knowing he was in prison for raping a 12–year–old girl, had "contact with drugs and selling drugs," and was a suspected gang member. At trial, Leja admitted that she lied to her supervisors about the relationship.

After being fired from her job, she continued writing letters to him, professing her love with proclamations such as

> I love you so much. If there is anything I can do, let me know. If you want money, I'll get it. I'll do anything for you if I could. I love you.

As events unfolded, her words proved only too true.

While Leja would have us focus on her tears and regrets, the standard of review requires us to focus on the evidence that supports the second-degree murder verdict and the trial court's decision to depart upwardly. To that end, Tina Leja was the lynchpin in this crime. As the trial court remarked, if Leja had not allowed Smith to overcome her "good judgment and will," Holder "would be alive today." Instead, as Holder's mother stated, Leja "served [Bobby] up on a silver platter to Darnell, knowing full well what Darnell was about."

4. The level of activity necessary to prove accomplice liability for a crime is that the defendant played a knowing role in its commission, as distinguished from mere presence, inaction, knowledge or passive acquiescence; active participation in the offense is not required, however, and the defendant's presence, companionship and conduct before and after the offense is committed are relevant considerations. *State v. Gates,* 615 N.W.2d 331, 337 (Minn.2000).

1. Although a majority of the Court does not join in the opinion authored by Justice Paul Anderson, because the special concurrence agrees with the result reached, I will refer to Justice Paul Anderson's opinion as the majority opinion.

Leja had her day in court. She told her story of being afraid of Smith and being controlled by him. But the jury and the judge had to reconcile her "remorseful" version of the facts with the stark reality of what was—and was not—done. In the end, the jury rejected her defense of duress and convicted her for the death of Holder. The judge, hearing the same evidence, decided that her role in the crime was anything but "typical."

Leja's own chilling testimony tells us what, in fact, ensued after she lured Holder to the apartment where he was beaten and shot. As Holder was being beaten, she did not try to intervene, and she did not try to help Holder after he was shot. Instead, she remained in the bedroom where Holder was shot and slept through the night with the body on the floor at the foot of the bed. When she woke up many hours later with Holder's blood still on her, she took a shower and then accompanied Smith and Andre Parker to a St. Paul park. When they could not "find a good spot to leave a body," Smith told her to "take the body" and "get rid of it." And she did. Not only did she lure Holder to his death, she was the principal agent of the concealment of his dismembered remains.

In Leja's own words, she got into her car and started driving *alone*—with her cell phone—and with Holder's body parts packed in a cooler in the trunk of her car. While acknowledging that Smith was not present, that she "did not have a gun to her head" or a "knife to her throat," she chose not to call the police and did not do anything to attract the attention of the police. Instead, she led Parker, who was following her in Holder's car, to Wisconsin and picked the exact spot to abandon his car—in front of a sign in the parking lot stating that the car would not be towed for 14 days. She also chose the swampy back-yard area of her father's unoccupied house in Wisconsin to bury Holder's torso. After burying the torso, Leja and Parker continued on a lengthy drive through western Wisconsin and northeast Minnesota to abandon the other body parts. On cross-examination, Leja acknowledged that Parker did not threaten her, did not have a gun, and did not strike her.

Leja's defense that she left "clues" around her father's property in the hopes of being caught is belied by her own testimony. Not only did she acknowledge on cross-examination that she knew that the house was unoccupied and in a rural, sparsely populated area, she also testified that she did not tell her father anything about Holder or ask for help when her father called her and told her he had found the torso buried on his property. The day after she returned from disposing of the body parts, Leja was back at work—working for two full weeks. During this time, she talked with her father, her law-student sister, and coworkers. She never asked any of them for help. She even lied to the agent assigned to investigate Holder's death when he asked her if she knew anything about the death. Instead of seeking help, when the "heat was on," she fled with Smith to Mississippi.

These facts lead to the inescapable conclusion that Leja's trial testimony that she was frightened by Smith and "wanted to get caught" was not credible. The jurors simply did not see her as a victim and found her guilty of second-degree murder. The majority fails to acknowledge this fact and instead emphasizes that "she was not the person who assaulted and shot Holder or dismembered his body." This focus ignores our law that under the aiding and abetting statute, Leja is "criminally liable" for the assault of Holder, as well as his death. Minn.Stat. § 609.05, subd. 1 (2002). By virtue of her conviction of second-de-

gree felony murder, the jury found that Leja intentionally aided, advised, counseled, or conspired to commit the assault of Holder, and his death was a foreseeable consequence of the assault. Minn.Stat. § 609.05, subds. 1, 2 (2002); § 609.19, subd. 2(1) (2002).

Contrary to the suggestions of the majority, the horrific death, decapitation, dismemberment, and disfigurement of Holder should not be considered a "distract[ion]" in reviewing Leja's sentence for his murder. Indeed, our prior decisions have held aiders and abettors accountable at sentencing for the cruelty inflicted by other participants in the crime. For example, in the case of *State v. Campbell,* 367 N.W.2d 454, 460–61 (Minn.1985), we reviewed a sentencing departure for the girlfriend of a man who brutally killed a woman. The defendant in that case did not assist in the actual murder, but helped her boyfriend gain access to the victim's apartment, maced the victim, and helped conceal the crime afterward. *Id.* at 457. In affirming the sentencing departure, we concluded that, in addition to other aggravating factors, the "murder was committed with particularly cruelty" and explained *"even if* defendant did not inflict the brutal injuries and psychological terror which proceeded and were part of the murder, as a participant she was legally responsible for those actions under Minn.Stat. § 609.05," the aiding and abetting statute. *Id.* at 461 (emphasis added). Similarly, in a case where a robbery victim was severely beaten, we disagreed with the trial court's determination that legal grounds did not exist for a departure on the basis that the defendant did not participate in the attack on the victim, holding that aggravating circumstances were present and observing that *"[e]ven if* defendant did not inflict the injury on the victim, as a participant in the robbery he was legally responsible for the injury under Minn.Stat. § 609.05 (1980)."

*State v. Jones,* 328 N.W.2d 736, 738 (Minn. 1983) (emphasis added) (discussing aiding and abetting statute).

Like those cases, this is not a case where the defendant appears on the scene after the crime has been completed. In fact, Leja admitted at sentencing that through her actions she "ultimately caused [Holder's] death." In sentencing Leja, the trial court focused on her "principal role" in his death, noting that her "footprints are in every chapter." Nonetheless, the majority tries to isolate Leja's conduct to her "participation in the concealment of Holder's remains" and then concludes that her participation in the concealment of the remains, "without more," does not support an upward durational departure.

Not only is the majority incorrect in finding that Leja played a minor role in this crime, we never have held, as the majority does today, that concealment alone is not a sufficient basis for an upward departure. Rather, this court has considered concealment to be an appropriate aggravating factor in sentencing for over 20 years. *See State v. Ming Sen Shiue,* 326 N.W.2d 648, 655 (Minn.1982). Since *Shiue,* we have affirmed other sentencing departures based in part on the fact that the defendant had concealed the murder victim's body. *See State v. Griller,* 583 N.W.2d 736, 744 (Minn.1998); *State v. Folkers,* 581 N.W.2d 321, 327 (Minn.1998). In *Folkers,* we stated that "finding that the victim was treated with particular cruelty *alone* would be enough to justify [a] departure," and cited approvingly the holding of *Shiue* that "concealment of the victim's body shows particular cruelty and is an appropriate aggravating circumstance justifying departure." *Folkers,* 581 N.W.2d at 327 (emphasis added) (citing *Shiue,* 326 N.W.2d at 655).

The dismemberment of Holder's body and the concealment of his remains, some of which were never recovered, demonstrate that the victim and his family were treated with particularly cruelty and adequately support the trial court's limited upward departure. In *Shiue,* we explained that treating concealment as an aggravating factor is justified by the trauma suffered by close relatives. 326 N.W.2d at 655. In this case, Holder's mother stopped working so that she could investigate his disappearance "day and night"; she spent "hours driving through Wisconsin in the woods looking for him"; and she has not been able to bury her son because she cannot find the rest of him. The majority states "there can be no dispute" that "Holder and his family were treated with particular cruelty," yet somehow concludes that this cruelty was not meted out by Leja. At sentencing, even Leja's own counsel acknowledged "[t]he pain she caused this family," remarking, "It is just inconceivable that would not be an aggravating factor."

The special concurrence asserts that the concealment of Holder's remains cannot be used to enhance the sentence for second-degree felony murder, relying on the decision of the court of appeals, which vacated Leja's conviction and sentence for the offense of accessory after the fact. According to the special concurrence, "the law of the case is that Leja cannot be convicted or sentenced for the offense of accessory after the fact arising out of the separate behavioral incident of concealment of the victim's body." The special concurrence concludes that "when, as a matter of law, the district court cannot convict or sentence for misconduct arising from a distinct behavioral incident, the court cannot rely upon such misconduct to enhance a

sentence for a different offense, arising out of a separate behavioral incident."

These statements are misleading, because Leja never argued that the concealment of the body arose from a distinct behavioral incident, and the court of appeals never even mentioned the issue, let alone based its holding on the fact that there were two distinct behavioral incidents. In fact, Leja consistently has taken the position throughout the trial proceedings and this appeal that her conduct constituted a single behavioral incident. At sentencing, defense counsel stated:

> She's convicted of many counts of what I consider to be a single behavioral incident. She committed a crime and without interruption covered it up.

In vacating the conviction of accomplice-after-the fact, the court of appeals simply concluded "it is not possible, as a matter of law, for a principal to be guilty of being an accomplice-after-the-fact." *State v. Leja,* 660 N.W.2d 459, 466 (Minn.App.2003). Nonetheless, the special concurrence persists in calling the concealment of the body a "separate offense." [2]

Moreover, the special concurrence's assertion that "the act of concealing the victim's dismembered body two days after the murder was a different behavioral incident 'separated by time, place, and motive' from the murder" is not supported by either the facts of this case or by our case law. "[A]part from the factors of time and place, the essential ingredient of any test" for determining whether there is a single behavioral incident is whether the conduct "was motivated by an effort to obtain a single criminal objective." *State v. Johnson,* 273 Minn. 394, 404, 141 N.W.2d 517, 525 (1966). In this case, Holder's remains were concealed, in defense counsel's words, so that Leja could "extricate her-

---

**2.** The state did not seek review of any issue  relating to the vacating of the conviction.

self." As Leja's counsel noted, such "[c]oncealment is a classic example of 'avoidance-of-apprehension.'" *See, e.g., State v. Gibson,* 478 N.W.2d 496, 497 (Minn.1991) (citing line of "avoidance-of-apprehension cases" where we have held that two crimes are part of the same course of conduct "if the defendant, substantially contemporaneously committed the second offense in order to avoid apprehension for the first offense"). In this case, the concealment was substantially contemporaneous with the murder. Although there was a day-and-a-half interval between Holder's death and the concealment of his remains, the medical examiner testified that the dismemberment of Holder's body would have involved a substantial amount of time and effort, and the dismemberment was followed by an aborted attempt to leave the remains at a park in St. Paul. In addition, Leja claims to have been in an extended post-homicidal slumber following Holder's death and still had his blood on her when she finally woke up. As defense counsel observed, "from the beginning to the end," there was "little interruption."

In summary, the concealment of the body was relevant to Leja's conviction of felony murder and therefore was an appropriate sentencing consideration. We have concluded that "a defendant's presence, companionship, and conduct before *and after* an offense is committed are relevant circumstances from which the jury may infer criminal intent" for aiding and abetting a crime. *State v. Gates,* 615 N.W.2d 331, 337 (Minn.2000) (emphasis added); *see also* 9 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 45.4 (3d ed.2001) (noting that evidence of "concealing or assisting another to escape" is relevant in "aiding and abetting" cases to prove that a crime was committed and that a defendant knowingly participated in it). If the jury could consider Leja's concealment of Holder's remains in finding her guilty of aiding and abetting the murder, it seems incongruous to conclude that the trial court may not consider it in sentencing for that offense.

A trial court "sits with a unique perspective on all stages of a case, including sentencing" and "is in the best position to evaluate the offender's conduct and weigh sentencing options." *State v. Hough,* 585 N.W.2d 393, 397 (Minn.1998). In this case, the trial court concluded that Leja played a major role in the crime by luring Holder to his death and "actively participat[ing] in taking him to Wisconsin, disposing of his car, burying his torso, [and] leaving his other remains at a roadside park where they can never be found."

Considering Leja's role in this heinous crime, I conclude that the trial court did not clearly abuse its discretion in imposing a limited upward departure of 1.4 times the presumptive sentence. After recognizing that this was a "gruesome crime" involving "particular cruelty" and that Leja's actions were "reprehensible," it is inconceivable that the majority could find that her conduct fails to reach the threshold of substantial and compelling circumstances needed to justify an upward durational departure. If not now, when? I would affirm the sentence imposed.[3]

---

**3.** As noted by the majority, the parties did not raise *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) or *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004) issues on appeal and they are therefore waived. Without deciding the issue, I further note that because the jury convicted Leja of accomplice-after-the-fact, Minn.Stat. § 609.495, subd. 3 (2002), the case may fall outside the holding in *Blakely.*

GILBERT, Justice (dissenting).

I join in the dissent of Chief Justice Blatz.

MEYER, Justice (dissenting).

I join in the dissent of Chief Justice Blatz.